UNITED STATES of America,
Appellant,

v.

Ronald S. JENKINS, Appellee.

No. 79, Docket 73-1572.

United States Court of Appeals,
Second Circuit.

Argued Sept. 12, 1973.

Decided Dec. 11, 1973.

---

James S. Carroll, New York City, for appellee.

L. Kevin Sheridan, Asst. U. S. Atty. (Robert A. Morse, U. S. Atty., E. D. N. Y., of counsel), for appellant.

Before LUMBARD, FRIENDLY and FEINBERG, Circuit Judges.

FRIENDLY, Circuit Judge:

This appeal by the United States from a judgment of the District Court for the Eastern District of New York dismissing an indictment after a bench trial is the latest in a growing list of cases showing that the eagerly awaited 1970 amendment of the Criminal Appeals Act, 18 U.S.C. § 3731, 84 Stat. 1890, has not resolved all the problems in this area.[1]

The statute, so far as here relevant, reads as follows:[2]

In a criminal case an appeal by the United States shall lie to a court of appeals from a decision, judgment, or order of a district court dismissing an indictment or information as to any one or more counts except that no appeal shall lie where the double jeopardy clause of the United States Constitution prohibits further prosecution.

. . . . . .

The provisions of this section shall be liberally construed to effectuate its purposes.

## I.

The indictment here at issue charged that defendant Jenkins, a registrant under the Universal Military Training and Service Act, "knowingly failed and neglected to perform a duty required of him under and in the execution of said Act and Regulations, by knowingly refusing and failing to submit to induction into the armed forces of the United States, after notice had been given to the defendant by Local Board No. 50, exercising jurisdiction in that behalf, requiring the defendant to report for induction on the 24th day of February, 1971," in violation of 50 U.S.C. App. § 462(a).

Jenkins waived trial by jury, and the case was heard by Judge Travia, who later filed an opinion containing findings of fact and conclusions of law. The facts developed at trial were as follows:

After receiving an order to report for induction on February 24, 1971, Jenkins wrote the Local Board asking to be reclassified as a conscientious objector. On the day before his scheduled induction, he went to the draft board and requested Form 150, the conscientious objector application form. In response to his request, a Board representative advised him to draft a brief statement

---

1. Although the Supreme Court has applauded the new Act, see United States v. Sisson, 399 U.S. 267, 307–308, 324–325, 90 S.Ct. 2117, 26 L.Ed.2d 608 (1970); United States v. Weller, 401 U.S. 254, 255 n. 1, 91 S.Ct. 602, 28 L.Ed.2d 26 (1971), this case and others herein cited show that the amendment has by no means solved all problems in this field.

2. The statute also directs:
    The appeal in all such cases shall be taken within thirty days after the decision, judgment or order has been rendered and shall be diligently prosecuted.

The judgment in this case was rendered October 24, 1972, and the Government's notice of appeal was filed on November 21, 1972, but its brief was not filed until June 13, 1973. This scarcely conforms with our notion of diligent prosecution and we would have dismissed the appeal on that ground if defendant had so requested. In United States v. Goldstein, 479 F.2d 1061, 1064 n. 4 (2 Cir. 1973), we admonished that, in appeals under 18 U.S.C. § 3731, the Government's brief should ordinarily be filed within 30 days after the notice of appeal.

summarizing his beliefs, which he did. The Board then denied his request for postponement of his induction. Jenkins failed to report for induction the next day and subsequently returned his completed Form 150 to the Board.

After extensive discussion, the court concluded that "The indictment in this case is dismissed and the defendant is discharged." Recognizing that in Ehlert v. United States, 402 U.S. 99, 91 S.Ct. 1319, 28 L.Ed.2d 625, decided on April 21, 1971, the Supreme Court had held that local boards need not consider conscientious objector claims filed by registrants after they receive their induction orders, the judge ruled that *Ehlert* should not be given retroactive effect in this case and that Jenkins' late-crystallizing conscientious objection claim was a valid defense to the criminal charge under this court's decision in United States v. Geary, 368 F.2d 144 (2d Cir. 1966), which *Ehlert* disapproved, 402 U. S. at 101 n. 3, 91 S.Ct. 1319, 28 L.Ed.2d 625. The Government contends that this ruling is contrary to our recent decision in United States v. Mercado, 478 F.2d 1108 (2 Cir. 1973), in which we applied *Ehlert* to a registrant with a conscientious objection claim that had allegedly crystallized after notice of induction. Appellee argues that *Mercado* is distinguishable. However, we do not reach that issue since, as we hold, we are without jurisdiction to entertain the Government's appeal.

## II.

Appellant asserts, and appellee does not dispute, that Congress intended to extend the Government's right of appeal in criminal cases as far as it constitu-tionally could. If the language of the statute left any doubts on that score, they would be set at rest by the report of the Senate Committee on the Judiciary, 91st Cong., 2d Sess., No. 91–1296, at 4–13. The appeal here will therefore lie unless the Double Jeopardy clause prevents interference with appellee's acquittal. To determine that question, we must look not merely to the familiar but unilluminating words of the Double Jeopardy clause, "nor shall any person be subject for the same offense to be twice put in jeopardy of life or limb," but also to its historical background, the proceedings leading to its adoption as part of the Fifth Amendment, and the course of decisions thereunder.

While the precise origin of the protection against double jeopardy is unclear, it is certain that the notion is very old.[3] The Greeks apparently treated the concept as part of a primitive form of *res judicata*. In 355 B.C., Demosthenes stated, "the laws forbid the same man to be tried twice on the same issue, be it a civil action, a scrutiny, a contested claim, or anything else of the sort." 1 Demosthenes 589 (Vance trans. 1962). Justinian's Corpus Juris Civilis recognized the special applicability of the principle to criminal proceedings through the maxim that "the governor should not permit the same person to be again accused of crime of which he has been acquitted." 11 Scott, The Civil Law 17 (1932).[4] Similarly, canon law early declared that "there shall not rise up a double affliction," a precept which was apparently based on the notion that God does not punish twice for the same offense. Bartkus v. Illinois, 359 U.S.

---

3. Justice Black characterized the "[f]ear and abhorrence of governmental power to try people twice for the same conduct" as "one of the oldest ideas found in western civilization." Bartkus v. Illinois, 359 U.S. 121, 151, 79 S.Ct. 676, 696, 3 L.Ed.2d 684 (1959) (Black, J., dissenting). A nineteenth century commentator went even further, asserting that "the principle is a part of that universal law of reason, justice, and conscience, of which Cicero said: 'Nor is it one thing at Rome and another at Athens, one now and another in the future, but among all nations it is the same.'" Bachelder, Former Jeopardy, 17 Am.L.Rev. 748 (1883).

4. Under Roman law the judgment upon an action between a defendant and his accuser was apparently not binding against a second accuser who was not a party to the first action, or at least who was not aware that the first prosecution was being brought. 21 Scott, *supra*, at 17–18.

121, 152 n. 4, 79 S.Ct. 676, 3 L.Ed.2d 684 (1959) (Black, J., dissenting). The related principle that clerics could not be punished in the king's courts after having been tried under canon law was a major source of the dispute between Becket and Henry II; Becket ultimately prevailed, albeit posthumously. 1 Pollock and Maitland, A History of English Law 448–49 (2d ed.1899). In the thirteenth century, as Bracton reports, the bar against multiple prosecutions assumed a rather grim urgency. Since many criminal offenses were tried by battle between the wronged party and the alleged offender, it was evident that a series of prosecutions would ultimately produce a "conviction" against all but the hardiest combatants, if enough "appealors" were willing to try their hands at the case. Once the defendant had endured one such trial for "one deed and one wound," Bracton wrote, "he will depart quit against all, also as regards the king's suit, because he thereby proves his innocence against all, as though he had put himself on the country and it had exonerated him completely." 2 Bracton, On the Laws and Customs of England 391 (Thorne trans. 1968).[5]

By the time of Lord Coke, the nascent double jeopardy concept had begun to mature into a complex of common law pleas, the most prominent of which were *autrefois acquit* and *autrefois convict*. The first, according to Coke, provided that a defendant could block a second trial by proving that he had previously been acquitted of the same offense. Similarly, under *autrefois convict* a defendant could plead a former conviction in bar of a second indictment for the same crime. See 3 Coke, Institutes of the Laws of England 213–14 (1797 ed.); 2 Hale, Pleas of the Crown 240–54 (Dougherty ed. 1800). Reprosecution after an acquittal was permitted, however, if the first indictment erroneously failed to charge an offense. In *Vaux's Case*, 4 Coke 44, 76 Eng.Rep. 992 (Q.B. 1591), it was held that if the first indictment was deficient for failure to charge all the elements of the felony and a second indictment was brought for the same offense, a plea of *autrefois acquit* would be bad even though the acquittal had not resulted from an objection to the indictment. A different rule applied in the case of an error of law committed by the court in the course of the trial. Even if the lower court's error was egregious, such as a mistaken direction by the judge that the felony was not committed on the day named in the indictment, or an erroneous determination that the conduct alleged and proved did not constitute a felony, the defendant could plead *autrefois acquit* to a second indictment.

Blackstone's careful classification of the various common law pleas in bar indicates that by the late eighteenth century, the status of the double jeopardy protection was well settled. The four pleas in bar, according to Blackstone, were *autrefoits acquit, autrefoits convict, autrefoits attaint* (former attaint, founded on the reasoning that "a second prosecution cannot be to any purpose, for the prisoner is dead in law by the first attainder"), and pardon. In terms that plainly anticipated the Fifth Amendment's language, Blackstone described it as a "universal maxim of the

---

5. Bracton's generous view of the emerging double jeopardy protection was not shared by his immediate successors. During the thirteenth and fourteenth centuries, a defendant's success in the quasi-criminal action of "appeal" lost its preclusive effect against a subsequent suit by the king, and *vice versa*, although success on an appeal would still bar a second appeal, and success on an indictment would bar a second prosecution by the crown. See 1 Britton 104 (Nicholas trans. 1865); Thayer, A Preliminary Trea-

tise on Evidence at the Common Law 158–59, 161 (1898).

By the fifteenth century, however, an acquittal on an appeal, at least after trial by jury, once again generally barred suit by the king, and an acquittal on an indictment could be pleaded as a bar to a subsequent appeal. Kirk, "Jeopardy" During the Period of the Year Books, 82 U.Pa.L.Rev. 602, 607 (1934); Friedland, Double Jeopardy 9 (1969).

common law of England, that no man is to be brought into jeopardy of his life more than once for the same offence." 4 Blackstone, Commentaries on the Laws of England 335–36 (Sharswood ed.1873). As in the time of Coke, the protection was afforded only if the defendant could legally have been convicted on the first indictment. 4 Blackstone, supra, 335 n. 5 (Chitty).

In two critical respects, however, the law changed between the seventeenth and eighteenth centuries. In 1660, the King's Bench disapproved earlier cases that had permitted the crown to seek a new trial after an acquittal. Rex v. Read, 1 Lev. 9, 83 Eng.Rep. 271 (K.B. 1660). Although the ruling was made over the dissent of a well-respected judge, the court stuck to its position with increasing confidence in later cases. See, e. g., Rex v. Jackson, 1 Lev. 124, 83 Eng.Rep. 330 (K.B.1661); Rex v. Fenwick & Holt, 1 Sid. 149, 153, 82 Eng.Rep. 1025, 1027 (1663). See also 21 Viner, A General Abridgement of Law and Equity 478–79 (1793).[6] By the time of Blackstone, it appears that although the king was theoretically permitted to bring a writ of error when the error appeared on the face of the record, Friedland, Double Jeopardy 287 (1969), the prosecution could not be granted a new trial unless the defendant had obtained his acquittal by fraud or treachery. See 2 Hawkins, Pleas of the Crown, ch. 35 § 8; ch. 47 § 12; ch. 50 §

10 (6th ed. 1788); 1 Chitty, The Criminal Law 657, 747 (Am. ed. 1836); 4 Stephen, New Commentaries on the Laws of England 456 (1845 ed.). See also United States v. Sanges, 144 U.S. 310, 312, 12 S.Ct. 609, 36 L.Ed. 445 (1892).[7] During the same period, defendants gradually won broader rights to appeal from a conviction. Through the 1660's, the court of King's Bench refused to grant defendants the right to a new trial upon proof of error in the first, Rex v. Lewin, 2 Keble 396, 84 Eng.Rep. 248 (K.B.1663); Rex v. Marchant, 2 Keble 403, 84 Eng.Rep. 253 (K.B.1663), but in the next decade the court reversed its stance and decided that a defendant could have a new trial in at least some circumstances. Rex v. Latham & Collins, 3 Keble 143, 84 Eng. Rep. 642 (K.B.1673); Rex v. Cornelius, 3 Keble 525, 84 Eng.Rep. 858 (K.B. 1675). Nonetheless, there were still strict limitations on defendants' appeal rights. Even in the eighteenth century, in capital cases the defendant's writ of error could not be taken without the king's permission. See Rex v. Wilkes, 4 Burr. 2527, 2551, 98 Eng.Rep. 327, 340 (K.B.1770); The Ailsbury Case (Anonymous), 1 Salk, 264, 91 Eng.Rep. 232 (K.B.1699). Cf. United States v. Gilbert, 25 F.Cas. 1287 (No. 15,204) (C.C. D.Mass.1834 (Story, J.). Chitty noted that the court could grant a new trial after defendant brought a writ of error, "Not on the merits, but only for irregu-

6. Sir Matthew Hale contributed to the confusion over whether the king could have a new trial after an acquittal, since in his influential treatise he assumed that it was possible. For gross errors of law in the trial court, Hale commented that the king could seek reversal by writ of error and then indict the defendant de novo. He urged that in such a case, the appellate court should not simply enter a conviction, but should grant the defendant a new trial, "for possibly he hath other matter for his defense." 2 Hale, Pleas of the Crown 247 (Dougherty ed. 1800).

By 1691, however, the court of King's Bench had apparently forgotten both Hale's prescription and its own earlier inconstancy, for in Rex v. Davis, 1 Shower 336, 89 Eng.

Rep. 609 (K.B.1691), the reporter wrote that "a new trial was denied, for that the Court said, there could be no precedent shewn for it in case of acquittal." By 1776, defense counsel could assert confidently, "whenever, and by whatever means, there is an acquittal in a criminal prosecution, the scene is closed and the curtain drops." Duchess of Kingston's Case, 20 Howell, State Trials 355, 528 (1776).

7. Even the exception for fraud and treachery was somewhat doubtful. The text writers regularly recited the exception as the preferable rule, but Friedland reports that in only one case was the exception actually applied to overturn an acquittal. Friedland, Double Jeopardy 286 & n. 4 (1969).

larity in the proceedings." 1 Chitty, *supra*, at 654. In misdemeanor cases the writ of error was discretionary with the court, but by the end of the eighteenth century, as Stephen observed, a writ of error could be brought "for notorious mistakes in the judgment or other parts of the record." He added that if the defendant won a reversal, "he remains liable to another prosecution for the same offence; for the first being erroneous, he never was in jeopardy thereby." 4 Stephen, New Commentaries on the Laws of England 456–58 (1845 ed.).

Although the documentary history of the Double Jeopardy clause is scanty, the available evidence suggests that the draftsmen of the Bill of Rights intended to import into the Constitution the common law protections much as they were described by Blackstone. Madison's first version of the clause, which he introduced in the House of Representatives on June 8, 1789, read: "No person shall be subject, except in cases of impeachment, to more than one punishment or one trial for the same offence." 1 Annals of Congress 434 (1789).[8] In the course of the debate in the House over the proposed amendments, Representative Benson argued against Madison's language on the ground that its meaning appeared "rather doubtful." Benson presumed that the amendment "was in-

tended to convey what was formerly the law, that no man's life should be more than once put in jeopardy for the same offense." Yet it was well known, he insisted, that a defendant was entitled to more than one trial, upon reversal of his original conviction. Representative Sherman agreed, adding that the amendment as it stood might appear to prevent a defendant from suing out a writ of error in his own behalf. In defense of Madison's proposal, Representative Livermore stated that the clause was in fact declaratory of the law as it stood, and suggested that making any changes would risk giving the impression that Congress intended to change the law by implication. 1 Annals of Congress 753 (Aug. 17, 1789).

The Senate rejected Madison's language in favor of the more traditional common law expression, employing the term "jeopardy," rather than specifying "more than one punishment or one trial."[9] Although the report of the Senate debates is unenlighteningly perfunctory, the Senate's choice of language that closely tracked the traditional characterization strongly suggests that the Senate intended to ensure that the Double Jeopardy clause incorporated the protections for defendants that the common law had come to provide—neither more nor less.[10] The history may leave it open to

---

8. This language, which rather clearly would have prevented a government appeal that would require a new trial, may have stemmed from Maryland's proposal that in criminal cases "there be no appeal from matter of fact, or second trial after acquittal." 2 B. Schwartz, The Bill of Rights: A Documentary History 732 (1971).

9. The Senate's language may have derived largely from the proposed amendment offered by the New York Ratifying Convention, which read in part, "That no person ought to be put twice in jeopardy of Life or Limb for one and the same offence." 2 B. Schwartz, *supra*, at 912. The language also closely tracked the common law formulation as it was understood at the time. In 1788, for example, a Pennsylvania court recited, "by the law it is declared that no man shall twice be put in jeopardy for the same of-

fence." Respublica v. Shaffer, 1 Dall. 236, 237, 1 L.Ed. 116 (Phil. Oyer & Term. 1788).

10. The case law in the thirteen original states at the time the Bill of Rights was drafted gives some further insight into the dimensions of the common law protection the drafters thought they were building into the Fifth Amendment. The few reported cases touching on the problem of appeals in criminal cases generally stated or appeared to assume that the prosecution could not appeal from an acquittal, even though the defendant under the proper circumstances could appeal from his conviction. See Hannaball v. Spalding, 1 Root 86 (Conn. 1789); Coit v. Geer, 1 Kirby 269 (Conn. 1787); Steel v. Roach, 1 Bay's R. 61 (S.C.1788). Contra, State v. Hadock, 2 Haywood 162 (N.C.1802), overruled in State v. Jones, 1 Murphy 257 (N.C.1809). Later cases demonstrate that during the nineteenth century,

argue that the framers did not regard the crown's inability to appeal an acquittal after a trial on the merits as part of the common law concept of double jeopardy but rather as an independent principle, to be followed for a century but not incorporated in the clause, although the general flavor of the debate, especially the emphasis on the defendant's right to a retrial, is somewhat to the contrary. However, any uncertainty as to the disposition of this case is resolved, as far as we are concerned, by Supreme Court decisions, to which we now turn.

### III.

In its first century, the Double Jeopardy clause posed relatively few difficulties for the Supreme Court. The problems that did arise, such as reprosecution after a mistrial, United States v. Perez, 9 Wheat. (22 U.S.) 579 (1824), multiple punishment on a single verdict, Ex parte Lange, 85 U.S. (18 Wall.) 163, 21 L.Ed. 872 (1873), and consecutive prosecutions by different sovereigns for the same conduct, Moore v. Illinois, 55 U.S. (14 How.) 13, 14 L.Ed. 306 (1852), were familiar to the English courts, and in applying the clause the Supreme Court relied heavily on the common law analysis.

The problem of government appeals did not reach the Supreme Court until United States v. Sanges, 144 U.S. 310, 12 S.Ct. 609, 36 L.Ed. 445 (1892). In that case, the Court carefully reviewed the common law authorities in England and in many states and concluded that in the absence of an express enabling statute, the Government could not bring an appeal in a criminal case from any adverse determination below, whether the decision in the trial court was based on a question of fact or of law. Although some of the state cases went on grounds of double jeopardy, the Court neither adopted nor rejected this ground

of decision. Rather it left open whether and under what circumstances a federal statute authorizing appeal by the Government from an acquittal would pass constitutional muster.

Kepner v. United States, 195 U.S. 100, 24 S.Ct. 797, 49 L.Ed. 114 (1905), squarely presented the question whether a provision against double jeopardy, there embodied in an act for the government of the Philippines, 32 Stat. 691, 692 (1902), prevented an appeal by the Government after an acquittal at trial. Kepner, a Philippine attorney, had been acquitted of the charge of embezzlement after trial to the court. The Government appealed to the Supreme Court of the Philippines, pursuant to local custom; that court reversed the acquittal, found Kepner guilty, and sentenced him. A sharply divided Supreme Court reversed the conviction and held that an acquittal in the trial court absolutely barred government review by appeal, and that under the Double Jeopardy clause this would be true in the United States even if a statute purported to grant the Government appeal rights. Mr. Justice Day, writing for five Justices, quoted at length from United States v. Ball, 163 U.S. 662, 16 S.Ct. 1192, 41 L.Ed. 300 (1896), where the Court, refusing to follow *Vaux's Case*, *supra*, had held that the Government could not bring *a new prosecution* after the defendant had been acquitted of the same offense under a defective indictment which he had not challenged. Although the problem of appeal is obviously distinct from that of a second prosecution, the Court relied, 195 U.S. at 129–130, 24 S.Ct. 797 on a dictum from *Ball* saying, 163 U.S. at 671, 16 S.Ct. at 1195, 41 L.Ed. 300 "The verdict of acquittal was final, and could not be reviewed, on error or otherwise, without putting [the defendant] twice in jeopardy, and thereby violating the Constitution." Mr. Justice Holmes, joined by two other Justices,[11] filed a vigorous

---

the rule became practically universal that the state could not appeal from an acquittal. See United States v. Sanges, 144 U.S. 310, 12 S.Ct. 609, 36 L.Ed. 445 (1892).

11. The ninth Justice, also dissenting, apparently would have agreed with the majority if the case had arisen in a federal court within the United States but believed that the Act

dissent. Relying heavily on the defendant's right to secure a new trial on appeal from a conviction, he argued that "logically and rationally a man cannot be said to be more than once in jeopardy in the same cause, however often he may be tried. The jeopardy is one continuing jeopardy, from its beginning to the end of the cause." 195 U.S. at 134, 24 S.Ct. at 806.

█ Two years later, as a result of unrelated developments, Congress passed the first Criminal Appeals Act, 34 Stat. 1246 (1907). The new statute allowed the United States to appeal from a district or circuit court to the Supreme Court in three categories of cases:

From a decision or judgment quashing, setting aside, or sustaining a demurrer to, any indictment, or any count thereof, where such decision or judgment is based upon the invalidity, or construction of the statute upon which the indictment is founded.

From a decision arresting a judgment of conviction for insufficiency of the indictment, where such decision is based upon the invalidity or construction of the statute upon which the indictment is founded.

From the decision or judgment sustaining a special plea in bar, when the defendant has not been put in jeopardy.

The first category clearly presented no constitutional problem since it dealt with cases where a defendant had not yet been put in jeopardy,[12] as Mr. Justice Holmes was quick to point out in United States v. MacDonald, 207 U.S.

120, 127, 28 S.Ct. 53, 52 L.Ed. 130 (1907). The third category also created no difficulty since it was expressly limited to cases where "the defendant has not been put in jeopardy," see United States v. Sisson, *supra*, 399 U.S. at 304–307, 90 S.Ct. 2117. The second category did not offend the principle that a defendant acquitted by the trier of fact could not be prosecuted again; it related only to a case where the defendant had been convicted and the judge later ruled he should not have been tried at all. The same analysis applies to the Act of May 9, 1942, 56 Stat. 271, authorizing an appeal to the courts of appeals from a decision or judgment "quashing, setting aside, or sustaining a demurrer or plea in abatement to any indictment or information, or any count thereof," or from a decision arresting a judgment of conviction, except, in either case, where a direct appeal could be taken to the Supreme Court. Although the 1948 amendment, 62 Stat. 844, altered the wording somewhat, the courts avoided any potential difficulties by construing the Act, not according to what the revisers had written, but according to the interpretation that had been given the prior statutory language. See United States v. DiStefano, 464 F.2d 845, 847–848 (2 Cir. 1972); United States v. Apex Distributing Co., 270 F.2d 747 (9 Cir. 1958). Since the United States could not appeal at all prior to the Criminal Appeals Act of 1907 and since that statute did not permit appeals after acquittals on the merits, the dearth of federal authority on the problem before us is not surprising.[13]

---

of Congress was not intended to change the previous Philippine practice whereby "the jeopardy did not terminate, if appeal were taken to the audiencia or supreme court, until that body had acted upon the case." 195 U.S. at 137, 24 S.Ct. at 808.

12. The general rule is that jeopardy attaches when the jury is selected and sworn or, in a bench trial, when the judge begins to hear evidence. Wade v. Hunter, 336 U.S. 684, 688, 69 S.Ct. 834, 93 L.Ed. 974 (1949); Green v. United States, 355 U.S. 184, 188, 78 S.Ct. 221, 2 L.Ed.2d 199 (1957); United States v. Jorn, 400 U.S. 470, 479, 91 S.Ct.

547, 27 L.Ed.2d 543 (1971); McCarthy v. Zerbst, 85 F.2d 640, 642 (10 Cir.), cert. denied, 299 U.S. 610, 57 S.Ct. 313, 81 L.Ed. 450 (1936). The conclusion that jeopardy attaches when the trial commences, Justice Harlan pointed out in United States v. Jorn, *supra,* "expresses a judgment that the constitutional policies underpinning the Fifth Amendment's guarantee are implicated at that point in the proceedings." 400 U.S. at 480, 91 S.Ct. at 555.

13. The states have adopted a wide variety of schemes concerning appeals by the prosecution, a few permitting appeal from an ac-

The first Supreme Court decision after. *Kepner* that is of real relevance is Fong Foo v. United States, 369 U.S. 141, 82 S.Ct. 671, 7 L.Ed.2d 629 (1962). In what promised to be a long criminal trial, three government witnesses had testified and a fourth was in the process of doing so when the district judge directed the jury to return verdicts of acquittal,[14] and then entered a formal judgment of acquittal as to all defendants. The judge acted because of what he considered a lack of credibility in the government's initial witnesses and improper conduct by the prosecutor. Considering the trial court's action to have been a usurpation of judicial power, the court of appeals issued mandamus requiring that the judgment of acquittal be vacated. It held that since the judge lacked power to direct the acquittal, the judgment was void and would not support a plea of *autrefois acquit*.[15] The Supreme Court reversed in a brief per curiam opinion, relying on the same dictum from *Ball* that had formed the basis of *Kepner*. The Court said, 369 U.S. 141, 143, 82 S.Ct. 671, 672 (1962):

The petitioners were tried under a valid indictment in a federal court which had jurisdiction over them and over the subject matter. The trial did not terminate prior to the entry of judgment . . . . It terminated with the entry of a final judgment of acquittal as to each petitioner. The Court of Appeals thought, not without reason, that the acquittal was based upon an egregiously erroneous foundation. Nevertheless, "[t]he verdict of acquittal was final, and could not be reviewed . . . without putting [the petitioners] twice in jeopardy, and thereby violating the Constitution."

The only later Supreme Court decision directly relevant to our problem is United States v. Sisson, 399 U.S. 267, 90 S.Ct. 2117, 26 L.Ed.2d 608 (1970). Sisson, like Jenkins, had been charged in a standard indictment with violating 50 U.S.C. App. § 462(a) by failing to obey an order to submit to induction. After the judge had denied various motions to dismiss the indictment, the case went to a rather confused trial. Although Sis-

---

quittal, some permitting appeal in certain classes of cases or from certain trial court orders, and some permitting no appeal whatsoever. See Miller, Appeals by the State in Criminal Cases, 36 Yale L.J. 486 (1927); Mayers & Yarbrough, Bis Vexari: New Trials and Successive Prosecutions, 74 Harv.L.Rev. 1 (1960). Connecticut, Vermont and Wisconsin have all enacted statutes permitting the state to appeal from acquittals, Conn.Gen.Stat.Ann. § 54–96 (Supp. 1973); Vt.Stat.Ann. tit. 13 § 7403 (1958); Wis.Stat.Ann. § 974.05(1)(e) (1971), repealed, 1971 Laws, ch. 298 § 25. In each case, however, the state's appeal has been strictly limited to errors of law and further cabined by rigid procedural restrictions. As a result, the state has made sparing use of its appeal rights in these three jurisdictions, and the courts have experienced little difficulty in distinguishing findings of fact, which are immune from review, and determinations of law, which can be appealed. See, e. g., State v. Dennis, 150 Conn. 245, 188 A.2d 65 (1963) (erroneous instruction); State v. Ballou, 127 Vt. 1, 238 A.2d 658 (1968) (erroneous direction of acquittal); State v. Stang Tank Lines, 264 Wis. 570, 59 N.W.2d

800 (1953) (suspension of fine held outside trial court's discretion).

Although the Wisconsin constitution contains a double jeopardy clause, the state supreme court upheld the government appeal statute, expressly relying on Justice Holmes' reasoning in his dissent in *Kepner*. State v. Witte, 243 Wis. 423, 431, 10 N.W.2d 117, 120 (1943). The Wisconsin provision was repealed two years ago in recognition of the Supreme Court's decision in Benton v. Maryland, 395 U.S. 784, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969), which held the Double Jeopardy clause binding on the states.

14. The judge announced to the defendants, "You have been acquitted by direction of the Court and by the Court. Your bail is terminated. You are free." In re United States, 286 F.2d 556, 560 (1 Cir. 1961).

15. Judge Aldrich concurred on the basis that he was certain that the judge had acted solely because of an erroneous view of improper prosecutorial conduct; if the judge had directed acquittal because of his belief, however erroneous, in the lack of credibility of the government witnesses, Judge Aldrich wrote, he would not have been guilty of a usurpation of power, 286 F.2d at 565.

son offered some testimony that might be deemed relevant to a claim of conscientious objection, 399 U.S. at 274–275, 90 S.Ct. 2117, 26 L.Ed.2d 608 the case was submitted to the jury on the issue whether Sisson's refusal to submit to induction was wilful. The jury brought in a guilty verdict. The defendant thereupon moved to arrest the judgment, F. R.Cr.P. 34, on the ground that because of the alleged illegality of the Vietnam war, the court lacked jurisdiction. Not passing on this claim, the court purported to "arrest judgment" on the ground that Sisson had satisfied the court that he had genuine moral objections to combat service in Vietnam and that to compel him to render such service would violate the Free Exercise provision of the First Amendment and the Due Process Clause of the Fifth. The court ruled also that § 6(j) of the Selective Service Act, 50 U.S.C. App. § 456(j), violated the Establishment Clause.[16] In an opinion by Mr. Justice Harlan, the Supreme Court dismissed the Government's appeal for want of jurisdiction.

Much of Justice Harlan's opinion was devoted to demonstrating that, despite its language, the district court's order was not in fact one "arresting a judgment of conviction for insufficiency of the indictment or information where such decision is based upon the invalidity or construction of the statute upon which the indictment or information is founded," the language of § 3731 at that time. This conclusion rested on two bases: (1) "that a judgment can be arrested only on the basis of error appearing on the 'face of the record,' and not on the basis of proof offered at trial," 399 U.S. at 281, 90 S.Ct. at 2125; and (2) that the court's adverse decision was not for insufficiency of the indictment, 399 U.S. at 287–288, 90 S.Ct. 2117, 26 L.Ed.2d 608. If the opinion had stopped there, it would have little bearing on the instant case. But it did not, and for an important reason—the portion of the opinion up to that point had the assent of only four members of the Court.

There followed slightly over two pages in which alone Justice Harlan wrote for a majority, 399 U.S. at 288–290, 90 S.Ct. at.2129. These began by saying:

The same reason underlying our conclusion that this was not a decision arresting judgment—i. e., that the disposition is bottomed on factual conclusions not found in the indictment but instead made on the basis of evidence adduced at the trial—convinces us that the decision was in fact an acquittal rendered by the trial court after the jury's verdict of guilty.

The Justice then propounded a hypothetical case similar to *Sisson* except that the trial judge instructed the jury to acquit if they made the same factual findings that the court in *Sisson* had reached in its post-trial opinion. If the jury had then acquitted, Justice Harlan wrote, there could be "no doubt that its verdict of acquittal could not be appealed under § 3731 *no matter how erroneous the constitutional theory underlying the instructions*," 399 U.S. at 289, 90 S.Ct. at 2129 (emphasis in original). This was followed by a quotation from the remarks of Senator Knox concerning the bill that was to become the Criminal Appeals Act, 41 Cong.Rec. 2752, saying, *inter alia:*

The Government takes the risks of all the mistakes of its prosecuting officers *and of the trial judge in the trial,* and it is only proposed to give it an appeal upon questions of law raised by the defendant to defeat the trial and if it defeats the trial. (Emphasis in original).

It would still be arguable that all this was directed to the issue of construction of the Criminal Appeals Act. But the Justice then said:

Quite apart from the statute, it is, of course, well settled that an acquittal can "not be reviewed, on error or oth-

---

16. The district court's views were later held to be erroneous, Gillette v. United States, 401 U.S. 437, 91 S.Ct. 828, 28 L.Ed.2d 108 (1971).

erwise, without putting [the defendant] twice in jeopardy, and thereby violating the Constitution. . . . [I]n this country a verdict of acquittal, although not followed by any judgment, is a bar to a subsequent prosecution for the same offence," United States v. Ball, 163 U.S. 662, 671, 16 S.Ct. 1192, 1195, 41 L.Ed. 300 (1896). In a footnote to that passage, Justice Harlan added: "This principle would dictate that after this jurisdictional dismissal, Sisson may not be retried." *Id.* 399 U.S. at 289–290 & n. 18, 90 S.Ct. at 2129. The passage quoted from *Ball* was the very one that Mr. Justice Day had cited in *Kepner* for the proposition that the Double Jeopardy clause prohibited an appeal by the Government after acquittal in a criminal case and that the Court had again relied on in *Fong Foo.*

The Justice then disposed of three differences between his hypothetical and the *Sisson* case. Two of these are relevant here. It made no difference that "in this case it was the judge—not the jury—who made the factual determinations," since "judges, like juries, can acquit defendants," 399 U.S. at 290, 90 S. Ct. at 2129. It was likewise inconsequential that the judge had labeled his characterization an arrest of judgment rather than a post-verdict acquittal; what was important was what the judge did, not what he said.

■ These pages of the *Sisson* opinion seem to us to be dispositive of the instant case. In essence the judge's post-trial ruling in *Sisson* had made the

jury trial a nullity and had resulted in a trial to the judge, who had rendered a judgment of acquittal on the merits. Even though this action was based on an erroneous legal ground, the Double Jeopardy clause prevented a new trial.[17] Indeed, we have already interpreted *Fong Foo* and *Sisson* to mean precisely this. United States v. Weinstein, 452 F.2d 704, 709 (2 Cir. 1971), cert. denied, 406 U.S. 917, 92 S.Ct. 1766, 32 L.Ed.2d 116 (1972).[18]

Although the district judge here characterized his action as a dismissal, it is clear from the analysis in *Sisson* that for double jeopardy purposes he acquitted the defendant. His ruling was based on facts developed at trial, which were not apparent on the face of the indictment, and which went to the general issue of the case. The dissent here contends that the district court's findings of fact were largely undisputed and not relevant to the pivotal legal issue in question. However, the discussion section of the district court's opinion makes it clear that it was relying on the precise circumstances of Jenkins' case to conclude that the Supreme Court's decision in *Ehlert* should not be applied retroactively to him. The district court was not construing the statute, which had been authoritatively interpreted in *Ehlert,* and holding that Jenkins did not come within it as a matter of law. It was holding that the statute should not be applied to him as a matter of fact.

Other courts of appeals have followed a similar course of inquiry in determin-

17. We see nothing in Justice Harlan's treatment of United States v. Covington, 395 U. S. 57, 89 S.Ct. 1559, 23 L.Ed.2d 94 (1969), in footnotes 19 and 56 of his opinion, to alter this conclusion. The decisive distinction was that in *Covington* the district court had dismissed an indictment *before trial* for insufficiency, without an evidentiary hearing or any need for one. The same was true in United States v. Boston & Maine R.R., 380 U.S. 157, 85 S.Ct. 868, 13 L.Ed.2d 728 (1965), upon which the dissent relies. See also United States v. Pecora, 484 F.2d 1289 at 1293 (3 Cir. 1973); United States v. Martin Linen Supply, 485 F.2d 1143, 1147 (5 Cir. 1973).

18. We are unable to understand what comfort the Government derives from that decision, where we vacated an order dismissing an indictment subsequent to a judgment of conviction as beyond the judge's power. Distinguishing *Fong Foo,* we said, 452 F.2d at 711 n. 10:

> There is no similar problem here. Vacating the order dismissing the indictment would simply leave the judgment of conviction unimpaired, subject to whatever remedies Grunberger may have with respect to it.

Jenkins has been *acquitted,* even if erroneously so.

ing whether a trial court's ruling should be deemed an acquittal. In United States v. McFadden, 462 F.2d 484 (9 Cir. 1972), the court considered a limited conscientious objection claim very similar to the one at issue in *Sisson*. Finding that the trial court had dismissed the indictment on the basis of evidence introduced at the trial, the Ninth Circuit held that the court had acquitted the defendant, and that he could not be retried. By contrast, the Seventh Circuit recently rejected a claim that an arrest of judgment constituted an acquittal. United States v. Esposito, 492 F.2d 6 (7 Cir. 1973), petition for cert. filed, — U.S. —, 94 S.Ct. 879, 38 L.Ed.2d 760 (1973). The trial court in *Esposito* had held that the offense of illegal possession and distribution of cocaine was "not one which Congress has power to prohibit in the manner attempted by 21 U.S.C. § 841." On appeal, the court held that the trial judge's decision had not been based on facts adduced at trial, but solely on his opinion that the statute was unconstitutional. The court wrote, slip opinion page 4, that

> it is clear from the order that the court concluded that the fatal defect in the prosecution lay in the indictment's failure to state and the statute's failure to require a nexus with interstate commerce which would justify federal regulation. The fact that the prosecution failed to prove such a connection though alluded to in the order, was of no significance to the actual basis for the decision.[19]

■ The Government argues that a reversal here would not require Jenkins to undergo the burden of a second trial, since the judge would simply be directed to alter his erroneous conclusions of law with respect to the non-retroactivity of Ehlert v. United States, 402 U.S. 99, 91 S.Ct. 1319, 28 L.Ed.2d 625 (1971), in light of our decision in United States v. Mercado, 478 F.2d 1108 (2 Cir. 1973), and Jenkins' only vexation would lie in being convicted rather than acquitted. We are not certain the matter is quite that simple since in *Mercado* we recognized the possibility of a successful defense by "a registrant who in fact reasonably relied in good faith on the case law or upon the knowledge that local boards in this circuit would consider a belated conscientious objection claim," 478 F.2d at 1111. But apart from that, the absence of need for a second trial would not distinguish *Sisson*. As Mr. Justice White pointed out in dissent, a reversal there on the basis that the trial judge's legal theory was incorrect would simply have meant that "the jury's verdict of guilty—with judgment no longer 'arrested'—simply remains in effect." 399 U.S. at 329, 90 S.Ct. at 2150. Furthermore, although what we must decide is the case before us, the Government has not sought a ruling limited to bench trials where an acquittal can be traced to a demonstrable error of law and no further evidentiary hearing is needed. It asserts that the amended Criminal Appeals Act entitles it to appeal every acquittal which can be demonstrated to be the result of an error of law by the judge. Boldly facing up to its problems, the Government contends that the Double Jeopardy clause should be read to

---

19. We have no occasion to consider the correctness of decisions that have extended this analysis to pre-trial rulings. In United States v. Ponto, 454 F.2d 657 (7 Cir. 1971) (en banc), a sharply divided court held that the Government could not appeal from a pre-trial dismissal granted because the judge felt that the circumstances of the case required that the defendant's selective service classification should have been reopened. See also United States v. McCreery, 473 F.2d 1381 (7 Cir. 1973) ; United States v. Southern Ry., 485 F.2d 309 (4 Cir. 1973). Similarly, in United States v. Rothfelder, 474 F.2d 606 (6 Cir.), cert. denied, 413 U.S. 922, 93 S.Ct. 3066, 37 L.Ed.2d 1044 (1973), the court held that the Government could not appeal from a pre-trial order dismissing an indictment when the trial court had made its ruling on the basis of information in the defendant's selective service file rather than simply on the basis of the sufficiency of the indictment. See also United States v. Hill, 473 F.2d 759, 761 (9 Cir. 1972) (court's pre-trial determination that materials were not obscene amounts to a ruling that the defendants were not guilty and thus barred appeal).

permit a retrial even on an erroneous instruction, a position Justice Harlan rejected out-of-hand in *Sisson,* 399 U.S. at 289, 90 S.Ct. 2117, 26 L.Ed.2d 608. We think that, so long as *Kepner* and *Sisson* stand, the clause forbids a retrial whenever the trier of the facts has rendered a legal determination of innocence "on the basis of facts adduced at the trial relating to the general issue of the case." 399 U.S. at 290 n. 19, 90 S.Ct. at 2130.

■ The short of the matter is this: *Kepner* held that an acquittal on the general issue barred an appellate court from entering a judgment of conviction on appeal. Since under Philippine practice no further proceedings were required below, the decision belies any view that the Double Jeopardy clause protects only against the vexation of a second trial. *Fong Foo* held that a directed acquittal barred a retrial even when it was plain that the acquittal was occasioned by clear error of the judge. *Sisson* held that when a guilty verdict had been nullified by a judge's decision to acquit on the merits, the Double Jeopardy clause prevented an appellate court from directing the entry of a judgment of conviction. We cannot see how in the circumstances here presented the Government can thread a way through this thicket so long as these decisions stand.[20]

We add a final word to make clear what we have *not* decided. We are not dealing with appeals by the Government before jeopardy has attached, see fn. 12, as in United States v. Crutch, 461 F.2d 1200 (2 Cir.), cert. denied, 409 U.S. 883, 93 S.Ct. 172, 34 L.Ed.2d 139 (1972); United States v. Castellanos, 478 F.2d 749 (2d Cir. 1973); and United States

v. Goldstein, 479 F.2d 1061 (2 Cir. 1973). We likewise are not dealing with cases where a trial is aborted after jeopardy has attached but before a conclusion of innocence or guilt, of which Illinois v. Somerville, 410 U.S. 458, 93 S.Ct. 1066, 35 L.Ed.2d 425 (1973), is the latest in a long line of Supreme Court decisions reaching back to United States v. Perez, 9 Wheat. (22 U.S.) 579 (1824). Finally, we are not dealing with a case, such as that cited in the Senate Report, *supra,* at 12, where the defense postponed until after the swearing of a jury a motion to dismiss an indictment which could as well have been made before, or with the problem presented by the decisions cited in footnote 19. We hold that when a defendant has been acquitted after trial on the merits, the Government cannot appeal from the judgment, even for an allegedly demonstrable error of law by the judge, so long as the Supreme Court adheres to the dictum in *Ball* and the decisions in *Kepner* and *Sisson.*

The appeal is dismissed for lack of jurisdiction on the ground that the Double Jeopardy clause prohibits further prosecution.

LUMBARD, Circuit Judge (dissenting):

After a trial before Judge Travia without a jury in the Eastern District of New York, the indictment charging Ronald Jenkins with violating 50 U.S.C. App. § 462(a) for failure to comply with an order to submit to induction into the armed forces was dismissed. In dismissing the indictment and discharging the defendant, Judge Travia concluded

20. Reexamination of the dictum in *Ball* that underlay *Kepner, Fong Foo* and *Sisson* may well be desirable, particularly now that the Double Jeopardy clause has been extended to the states. Benton v. Maryland, 395 U.S. 784, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969). Mr. Justice Cardozo, writing for an 8-man majority in Palko v. Connecticut, 302 U.S. 319, 323, 58 S.Ct. 149, 151, 82 L.Ed. 288 (1937), remarked "how much was to be said" for the *Kepner* dissent. See also Mayers and Yarbrough, Bis Vexari: New Trials

and Successive Prosecutions, 74 Harv.L.Rev. 1, 8–15 (1960); Miller, Appeals by the State in Criminal Cases, 36 Yale L.J. 486 (1927). Any such reexamination would also have to take account of the principle of implied acquittal developed in Green v. United States, 355 U.S. 184, 78 S.Ct. 221, 2 L.Ed.2d 199 (1957), and United States ex rel. Hetenyi v. Wilkins, 348 F.2d 844 (2 Cir. 1965) (Marshall, J.), cert. denied, 383 U.S. 913, 86 S.Ct. 896, 15 L.Ed.2d 667 (1966). But this is far beyond our power as an inferior court.

that the law had not been violated since Jenkins was not required to report for induction while his post-induction notice request for reclassification as a conscientious objector was still pending. On appeal, the government argued that Judge Travia's interpretation of the controlling law was clearly erroneous. Without actually deciding this issue, the majority of this panel now holds that the government has no right to appeal, since to permit it to do so would be to put the defendant in double jeopardy.

For two reasons, I am unable to join the majority in concluding that the government's appeal is barred in the present case by the Double Jeopardy Clause. First, I believe that Judge Travia's decision was precisely what he termed it, a dismissal of the indictment, an order from which a government appeal is not barred, when, as here, the dismissal is based on a construction of the statute upon which the indictment is founded. 18 U.S.C. § 3731.[1] Second, it is my firm belief that the majority's inflexible application of the Double Jeopardy Clause unnecessarily frustrates the fair administration of criminal justice.

With regard to the first of these points, it is, of couse, true, that Judge Travia's characterization of his decision as a dismissal of an indictment does not conclusively make it that for purposes of determining the government's right to appeal.[2] If his decision should more accurately have been described as an acquittal, then the Double Jeopardy Clause would prohibit this appeal. On the other hand, if Judge Travia's characterization is proper, then there is no obstacle to further government prosecution of this case.[3]

In determining the underlying identity of the trial judge's decision, we should first consider United States v. Sisson, 399 U.S. 267, 90 S.Ct. 2117, 26 L.Ed.2d 608 (1970). That case also involved a refusal to submit to induction on the basis of a claim for conscientious objector status. After a trial and a jury verdict of guilty, District Judge Wyzanski stated that the indictment against Sisson failed to "charge an offense." Based on the evidence adduced at trial, and in particular, the demeanor of the defendant, the judge concluded that Sisson was a "sincerely conscientious man" and that because of his genuine interest in not killing, the Free Exercise and Due Process Clauses prohibited application of the 1967 draft act to him. Accordingly, he granted the defendant's motion for an arrest of judgment.

Appealing directly to the Supreme Court,[4] the government claimed that the Court had jurisdiction under the "ar-

1. 18 U.S.C. § 3731 provides that:

In a criminal case an appeal by the United States shall lie to a court of appeals from a decision, judgment, or order of a district court dismissing an indictment or information as to any one or more counts, except that no appeal shall lie where the double jeopardy clause of the United States Constitution prohibits further prosecution.

The present version of § 3731, except for eliminating the government's right to appeal directly to the Supreme Court from the decision of a district court, in all other respects leaves intact the right to appeal which the government had under the former version of the statute. See p. 870 *supra*. Under that former version the government could appeal from a decision dismissing an indictment "where such decision is based upon the invalidity or construction of the statute upon which the indictment or information is founded."

2. As United States v. Sisson, 399 U.S. 267, 280, 90 S.Ct. 2117, 26 L.Ed.2d 608 (1970), makes clear, the appellate court must look behind the label used by the trial judge to determine the true nature of his decision.

3. The rationale for this distinction in treatment of acquittals and dismissals of indictments arises from the fact that a dismissal based upon the invalidity or construction of the statute on which the indictment was founded was not considered to have placed the defendant in jeopardy, since it was not a determination on the merits of the case. M. Friedland, Double Jeopardy 63 & 63 n. 1 (1969).

4. Former 18 U.S.C. § 3731, under which the appeal in *Sisson* was brought, permitted a direct appeal to the Supreme Court by the

resting judgment" provision of the Criminal Appeals Act, 18 U.S.C. § 3731. The Supreme Court, however, refused to hear the appeal, maintaining that the district judge's decision, although designated by him an "arrest of judgment," was, in fact, an acquittal, which was unappealable by the government under § 3731. In addition, the Court reasoned that being an acquittal, the appeal by the government was further barred by the Double Jeopardy Clause.

In concluding that Judge Wyzanski's decision had not been an arrest of judgment, but rather an acquittal, the Court emphasized that the disposition of the case had been "bottomed on factual conclusions not found in the indictment but instead made on the basis of evidence adduced at the trial," especially the demeanor of the defendant. The Court made clear, however, · that had the district judge granted the motion instead "on the face of the record," that is, on the basis that the indictment failed to charge any violation of the law, the ruling could have been regarded as an arrest of judgment and the government would have been permitted to appeal. See, e. g., United States v. Bramblett,

348 U.S. 503, 75 S.Ct. 504, 99 L.Ed. 594 (1955).

Just as a genuine arrest of judgment would have permitted a government appeal in *Sisson*, under § 3731, so, too, that statute would have allowed an appeal from a genuine dismissal of an indictment. But as *Sisson* makes clear, before an appellate court may exercise jurisdiction, it must inquire into the real nature of the trial judge's action to make certain that it is not an acquittal barring appeal. Thus the crucial consideration in this inquiry is whether the judge's decision was on the merits, that is, did it hinge on the facts adduced at trial or rather was it made independently "on the face of the record." In *Sisson*, Judge Wyzanski clearly relied upon the evidence at trial, and, in particular, on the demeanor of the defendant. In granting an arrest of judgment, he first made a finding on the factual issue of Sisson's sincerity as a conscientious objector.

Judge Travia's dismissal of the indictment against Jenkins, on the other hand, was essentially a legal determination construing the statute on which the indictment was based. 50 U.S.C. App. § 462(a).[5] In contrast to Judge Wyzan-

government from a decision arresting a judgment of conviction as well as one dismissing an indictment, "where such decision is based upon the invalidity or construction of the statute upon which the indictment or · information is founded." The present version of § 3731, under which the government seeks to appeal in *Jenkins* no longer permits direct appeal to the Supreme Court from the district court's decision. However, as has been noted, in all other respects it leaves intact the government right to appeal. See p. 870 *supra*.

5. Specifically, Judge Travia was of the view that 50 U.S.C. App. § 462(a), making it a crime to fail to comply with an induction order, was qualified by 32 C.F.R. § 1625.2, which provided that

The local board may reopen and consider anew the classification of a registrant (a) upon the written request of the registrant, the government appeal agent, any person who claims to be a dependent of the registrant, or any person who has on file a written request for the current deferment

of the registrant in a case involving occupational deferment, if such request is accompanied by information presenting facts not considered when the registrant .was classified, which, if true, would justify a change in the registrant's classification; or (b) upon its own motion if such action is based upon facts not considered when the registrant was classified which, if true, would justify a change in the registrant's classification; provided, in either event, the classification of a registrant shall not be reopened after the ·local board has mailed to such registrant an Order to Report for Induction (SSS Form No. 252) or an Order to Report for Civilian Work and Statement of Employer (SSS Form No. 153) unless the local board first specifically finds there has been a change in the registrant's status resulting from circumstances over which the registrant had no control.

In Judge Travia's view, this provision relieved an individual who had received his notice from reporting for induction so long as his request for reclassification was pending.

ski, Judge Travia was not required to resolve any factual issues in order to reach his decision. It is true that the judge did make nine findings of fact. But of these, six had no bearing whatever on the pivotal legal issue, whether or not the pertinent statute required an individual to report for induction if his post-induction notice request for conscientious objector status was still pending. Indeed, these six findings were undisputed. In any event, as the *Sisson* Court noted in discussing United States v. Halseth, 342 U.S. 277, 72 S.Ct. 275, 96 L.Ed. 308 (1952), even where the parties go so far as to stipulate facts not contained in the indictment for purposes of a motion to dismiss, an appeal will lie so long as "the facts in the stipulation were irrelevant to the legal issue." 399 U.S. at 285, 90 S.Ct. at 2127.

The other three findings of fact simply established that the defendant requested and returned the appropriate form for claiming conscientious objector status. While these findings bear some relation to the trial judge's ultimate conclusion of law—that Jenkins need not have reported for induction during the pendency of his request for reclassification—they hardly represent the sort of foundation for the decision that the findings in *Sisson* did. At no time, for example, was the court called upon to resolve a factual issue regarding whether the application for reclassification by Jenkins had actually been filed. To be sure, the government at the time of the return of the indictment was fully aware of this request for reclassification, having had access to his selective service file. The government could easily have made mention of that claim for conscientious objector status in the indictment. Had that been done, there would be no doubt but that Judge Travia's decision

would have been "on the face of the record" and thus a genuine dismissal of the indictment rather than an acquittal on the merits.

We do serious harm to the fair administration of criminal justice when we belabor technical requirements to the point where inclusion or omission of three innocuous, uncontested statements in the indictment ultimately determine whether the government may appeal from the trial judge's decision in a criminal case. We would also be penalizing the government for following a well-established and until now unquestioned rule that indictments need not state the entire factual background of a case, but may simply track the language of the statute allegedly violated and, in addition, do little more than state time and place in approximate terms. *See* F.R.Cr.P. 7(c); United States v. Fortunato, 402 F.2d 79, 82 (2d Cir. 1968), cert. denied, 394 U.S. 933, 89 S.Ct. 1205, 22 L.Ed.2d 463 (1969).

The Supreme Court's decision in United States v. Boston & Maine R.R. Co., 380 U.S. 157, 85 S.Ct. 868, 13 L.Ed.2d 728 (1965), offers substantial support for these views. That case involved an appeal by the government from a dismissal of one count of an indictment charging a violation of § 10 of the Clayton Act, which prohibits any commercial dealings by a common carrier in an amount greater than $50,000 with another enterprise in which officers of the carrier have "any substantial interest." Count I of the indictment had charged that the Boston & Maine R.R. and three of its officers had violated § 10 by arranging a sale of railroad equipment valued in excess of $50,000 to the International Railway Equipment Corp., in which the officers had a "substantial interest."

This view was in conflict with the law in the Second Circuit at the time, United States v. Mercado, 478 F.2d 1108 (2 Cir. 1973), the weight of authority in the other circuits, *e. g.* Ehlert v. United States, 422 F.2d 332 (9th Cir. 1970), Davis v. United States, 374 F.2d 1 (5th Cir. 1967), United States v. Al-Majied Muhammed, 364 F.2d 223 (4th Cir. 1966), United States v. Taylor, 351 F.2d 228 (6th Cir. 1965), and the position adopted by the Supreme Court after the date Jenkins was to report for induction, but before Judge Travia's decision. United States v. Ehlert, 402 U.S. 99, 91 S.Ct. 1319, 28 L.Ed. 2d 625 (1971).

The trial judge recognized that the indictment itself was sufficient to withstand the defendants' motion to dismiss. But based on information presented in the bill of particulars, he granted the motion. The bill of particulars had described the "substantial interest" cited in the indictment as consisting of an agreement among the defendants to use their efforts to produce profits for International Railway and that they would then get a share of these profits. On the basis of this description, the court found no violation of § 10 since "substantial interest" within the meaning of the statute was "limited to one who has a then present legal interest in the buying corporation . . . " The government appealed directly to the Supreme Court under § 3731 and the Court, without expressing any reservations as to its jurisdiction, reviewed the case, ultimately vacating the trial judge's decision and remanding for further consideration.

Just as in *Boston & Maine R.R.* the indictment here charged a criminal offense; yet, on the basis of certain undisputed facts not contained in the indictment, the trial judge construed the underlying statute as not applicable to the particular case. In light of this substantial similarity between the cases, *Boston & Maine R.R.* offers strong support for permitting an appeal in the present case.[6]

But entirely apart from the question whether Judge Travia's decision was a dismissal of an indictment or an acquittal, I believe there is still another reason for permitting the government to appeal in this case. Simply stated, it is my view that the Double Jeopardy Clause is not an abstract rule, but one that should be adapted and applied in light of the totality of circumstances of each particular case. As Judge Friendly's thoroughgoing history of the Clause reveals, its evolution has been clouded with contradictions, inconsistencies, and uncertainties. It would be a serious mistake slavishly to adhere to a rigid application of this fifth amendment protection. An unalterable rule that the Double Jeopardy Clause bars all government appeals from acquittals, fails to weigh against the individual's very proper interest in not experiencing the anxiety, expense, and harassment that a second trial brings, the equally considerable interest of society in the fair, just, and sensible administration of criminal justice.[7] Only last term, the Supreme Court in Illinois v. Somerville, 410 U.S. 458, 93 S.Ct. 1066, 35 L.Ed.2d 425 (1973), rejected the notion that technical errors resulting in a mistrial should bar reprosecution. In such cases, the "ends of public justice" demand that "the purpose of law, to protect society from those guilty of crimes [not] be frustrated by denying courts power to put the defendant to trial again." 410 U.S. at 470, 93 S.Ct. at 1073.

I believe that the "ends of public justice" will not be served if we permit a defendant who is clearly guilty to go free because of the trial judge's erroneous interpretation of the controlling law. That Jenkins is guilty would appear to be indisputable in light of our decision in United States v. Mercado, 478 F.2d 1108 (2 Cir. 1973), in which we held without reservation that even prior to United States v. Ehlert,[8] the

---

6. It is, of course, true that in *Boston & Maine R.R.* the appeal was brought under the former version of § 3731, while the appeal in the present case has been raised under the amended § 3731. Nevertheless, as the majority opinion correctly suggests, the amendments to § 3731 were in no way intended to restrict the government's right to appeal. Thus, if an appeal could have been brought under the prior § 3731, it may be brought under the amended version of the statute. See p. 700 *supra.*

7. For quite some time, legal commentators have urged a more flexible analysis in determining whether the Double Jeopardy Clause is applicable to the circumstances of a particular case. *See generally* Mayers & Yarbrough, Bis Vexari: New Trials and Successive Prosecutions, 74 Harv.L.Rev. 1 (1960); Note, Twice in Jeopardy, 75 Yale L.J. 262 (1965).

8. 402 U.S. 99, 91 S.Ct. 1319, 28 L.Ed.2d 625 (1971). In *Ehlert*, the Supreme Court held

law of this circuit was that an individual had to report for induction although his post-induction notice claim for conscientious objector status was still pending.

Accordingly, I would vacate the order of the court below and remand for a proper application of the law.

that an individual must comply with an induction notice even though his post-induction notice request for reclassification as a conscientious objector has not yet been decided. The individual, whose beliefs had crystallized between notice and induction, would be entitled to a prompt in-service determination of his claim.