UNITED STATES of America, Appellant,

v.

George LYNCH and Christopher Moscinski, Defendants–Appellees.

No. 18, Docket 97–1092.

United States Court of Appeals, Second Circuit.

Argued Sept. 10, 1998.

Decided Dec. 14, 1998.

Martin J. Siegel, Assistant United States Attorney, New York, N.Y. (Mary Jo White, United States Attorney, Southern District of New York; James L. Cott, Ira M. Feinberg, Assistant United States Attorneys, on the brief), for Appellant.

G. Robert Blakey, Notre Dame Law School, Notre Dame, IN (A. Lawrence Washburn, Jr., New York, New York, on the brief; John Broderick, Syosset, NY, Gabriel P. Kralik, Fish & Richardson P.C., New York, NY, of counsel), for Defendants–Appellees.

(William J. Hoffman and Lawrence R. Miller, Arnold & Porter, New York, NY, on the brief), for amici curiae United States Representatives Charles E. Schumer, Howard L. Berman, Eliot L. Engel, Robert Filner, Barney Frank, Maurice Hinchey, Nita M. Lowey, Constance A. Morella, Louise M. Slaughter and Lynn C. Woolsey; United States Senator Ron Wyden; James Brennan, Joan K. Christensen, Barbara M. Clark, Samuel Coleman, Gloria Davis, Jeffrey Dinowitz, Daniel L. Feldman, Sandra Galef, David F. Gantt, Deborah Glick, Richard N. Gottfried, Roger L. Green, Paul E. Harenberg, Audrey Hochberg, Susan V. John, Martin A. Luster, Nettie Mayersohn, William Scarborough, Edward C. Sullivan, Robert K. Sweeney, and Albert Vann, Members of the New York State Assembly; and New York State Senators Roy M. Goodman and Vincent L. Leibell.

(Bruce E. Yannett and Neil S. Binder, Debevoise & Plimpton, New York, NY; Yolanda S. Wu and Martha F. Davis, NOW Legal Defense and Education Fund, New York, NY; Priscilla J. Smith and Kathryn Kolbert, Center for Reproductive Law & Policy, New York, NY, on the brief), for amici curiae NOW Legal Defense and Education Fund, Center for Reproductive Law and Policy, Anti–Defamation League, Broome County Pro–Choice Coalition, Buffalo GYN Womenservices, Center for Constitutional Rights, Long Island Pro–Choice Coalition, New York State AAUW, New York County Chapter of American Academy of Family Physicians, People for the American Way, Planned Parenthood of New York City, Planned Parenthood of Rochester and the Genesee Valley, Planned Parenthood of Suffolk County, Inc., Pro–Choice Network of Western New York, and Republican Pro–Choice Alliance of New York.

(Labe M. Richman, Donna Lieberman, and Yueh-ru Chu, New York, NY, on the brief), for amici curiae New York Civil Liberties Union, the American Jewish Congress, Lambda, the National Emergency Civil Liberties Committee, and the Westchester Coalition for Legal Abortion, Inc.

Before: FEINBERG, JACOBS, and SACK, Circuit Judges.

Judge SACK concurs in the opinion of the Court, and also files a separate opinion.

Judge FEINBERG dissents in a separate opinion.

JACOBS, Circuit Judge:

The United States appeals from the acquittal following a bench trial in the United States District Court for the Southern District of New York (Sprizzo, *J.*) of persons charged with criminal contempt under 18 U.S.C. § 401(3) for allegedly violating a permanent injunction that prohibited them from further violations of the Freedom of Access to Clinic Entrances Act ("FACE"), 18 U.S.C. § 248. On appeal, the government argues that the district court erred in holding (i) that a finding of wilfulness was precluded by the sincere religious beliefs that prompted defendants' conduct and (ii) (alternatively) that the court could exercise a prerogative of leniency to acquit even if there were proof of guilt beyond a reasonable doubt. Defendants argue that regardless of any error the district court may have made in arriving at the February 11, 1997 judgment of acquittal, we lack appellate jurisdiction under 18 U.S.C. § 3731 and the Fifth Amendment's Double Jeopardy Clause. Because we conclude that further prosecution would constitute double jeopardy, we dismiss this appeal.

## BACKGROUND

The defendants, Bishop George Lynch and Brother Christopher Moscinski (also known as Brother Fidelis) are devout Roman Catholics who are conscientiously opposed to abortion. Since 1990, they have repeatedly protested outside the Women's Medical Pavilion, a clinic in Dobbs Ferry, New York in which abortions and other reproductive health services are performed. On several occasions, Lynch and Moscinski chose to protest the availability of abortion procedures at the clinic by sitting and praying in the clinic's driveway, thereby impeding access to the parking lot used by patients and doctors. On these occasions, they were arrested by the police, and removed.

On October 27, 1995, the United States Attorney filed a civil complaint, charging that the defendants' conduct violated FACE. One provision of that statute criminalizes action that "by physical obstruction, intentionally . . . interferes with or attempts to . . . interfere with any person" who is or has been "obtaining or providing reproductive health services." 18 U.S.C. § 248. On February 23, 1996, the district court issued a permanent injunction, the relevant portion of which bars the defendants from violating FACE by "impeding or obstructing automotive or any other form of ingress into, or egress from, the [Women's Medical Pavilion]."

On August 24, 1996, Lynch and Moscinski returned to their spot in the clinic's driveway. They were arrested and charged with criminal contempt. At the bench trial on

October 15, 1996,[1] the defendants stipulated that they were sitting in the driveway, that they knew of the permanent injunction, and that they knew the injunction prohibited them from obstructing automobile traffic into the clinic's parking lot. Although the district court accepted these stipulations as findings of fact, *see United States v. Lynch,* 952 F.Supp. 167, 168 (S.D.N.Y.1997), it ultimately acquitted both Lynch and Moscinski of criminal contempt, *see id.* at 172.

In a written opinion, the district court found "as a matter of fact" that the defendants' "sincere, genuine, objectively based and, indeed, conscience-driven religious belief, precludes a finding of willfulness." *Id.* at 170. Alternatively, the district court noted, even if the wilfulness element had been established to its satisfaction, the court would have exercised a "prerogative of leniency" to acquit them nevertheless. *Id.* at 171.

The government is now in the unaccustomed position of appealing the judgment of acquittal.

## DISCUSSION

The first question presented arises under the Double Jeopardy Clause of the Fifth Amendment and is one of appellate jurisdiction. The Criminal Appeals Act, 18 U.S.C. § 3731, provides that the courts of appeals have jurisdiction over government appeals "from a decision, judgment, or order of a district court dismissing an indictment or information ... *except that no appeal shall lie where the double jeopardy clause of the United States Constitution prohibits further prosecution."* 18 U.S.C. § 3731 (emphasis added).

■ There is no absolute double jeopardy bar to appellate review of a district court's judgment of acquittal. *See United States v. Wilson,* 420 U.S. 332, 336, 345, 95 S.Ct. 1013, 1018, 1023, 43 L.Ed.2d 232 (1975). The availability of appellate review in that circum-

stance depends on the essential character of the district court's judgment. *See United States v. Scott,* 437 U.S. 82, 98, 98 S.Ct. 2187, 2197, 57 L.Ed.2d 65 (1978); *United States v. Martin Linen Supply Co.,* 430 U.S. 564, 571, 97 S.Ct. 1349, 1354–55, 51 L.Ed.2d 642 (1977).

■ The government contends that its appeal is not barred because (1) the district court found facts sufficient to establish each of the four elements of a criminal contempt offense beyond a reasonable doubt;[2] (2) the judgment of acquittal was based solely on a legal error—the district court's view that the government was required to prove what the government characterizes as an additional element (bad intent or malice) that is not found in the criminal contempt context; (3) the Double Jeopardy Clause does not bar appellate review in such situations, *see United States v. Moore,* 613 F.2d 1029, 1038 (D.C.Cir.1979); *see generally* 15B Charles Alan Wright *et al., Federal Practice and Procedure* § 3919.5, at 661 (2d ed.1992); and (4) in a proper case, we would have power to direct entry of a judgment of conviction based on the district court's (supposed) finding that the prosecution established beyond a reasonable doubt each of the four required elements. We take up the government's arguments in order.

■ (1) We cannot agree that this is a case in which the district court found proof of all of the required elements of the offense. Contrary to the government's argument, the district court opinion does not reflect a finding that the fourth element of criminal contempt—wilfulness—was proven beyond a reasonable doubt. *See United States v. Cutler,* 58 F.3d 825, 834 (2d Cir.1995) (wilfulness is an element of criminal contempt). The district court made the following finding on the subject:

In this case, the Court finds as a matter of fact that Lynch's and Moscinski's sin-

---

1. The district court concluded that defendants had no right to trial by jury because the court had no intention of imposing a jail sentence in excess of six months in the event of a conviction.

2. To prove criminal contempt, the government must "prove beyond a reasonable doubt that: (1)

the court entered a reasonably specific order; (2) [the defendants] knew of that order; (3) [the defendants] violated that order; and (4) [their] violation was willful." *United States v. Cutler,* 58 F.3d 825, 834 (2d Cir.1995).

cere, genuine, objectively based and, indeed, conscience-driven religious belief, precludes a finding of willfulness. Willful conduct, when used in the criminal context, generally means deliberate conduct done with a bad purpose either to disobey or to disregard the law. *That kind of conduct is not present here.*

*Lynch,* 952 F.Supp. at 170 (citation omitted) (emphasis added). The business end of the district court's ruling was that the government failed to establish facts sufficient to prove the element of wilfulness.

■ (2) We also reject the government's contention that the district court required proof of bad intent as a separate, fifth element of the offense. Rather, the district court defined the element of wilfulness as requiring bad intent. No doubt, this was error. Wilfulness merely requires "a specific intent to consciously disregard an order of the court." *Cutler,* 58 F.3d at 837 (quoting *United States v. Berardelli,* 565 F.2d 24, 30 (2d Cir.1977)) (internal quotation marks omitted); *see United States v. Remini,* 967 F.2d 754, 757–58 (2d Cir.1992) (explicitly rejecting the argument that proof of malice or bad intent is a prerequisite to a finding of wilfulness in a criminal contempt case); *see also Rojas v. United States,* 55 F.3d 61, 63 (2d Cir.1995) (*per curiam*) (wilfulness requires proof of " 'a volitional act done by one who knows or should reasonably be aware that his conduct is wrongful' ") (quoting *United States v. Greyhound Corp.,* 508 F.2d 529, 531–32 (7th Cir.1974)); *cf. United States v. Weslin,* 156 F.3d 292, 298 (2d Cir. 1998) (*per curiam*) (intent to obstruct and interfere with access to reproductive health services "is all the intent" that FACE requires). Even godly motivation does not cancel this intent. *Cf. Weslin,* 156 F.3d at 298 (rejecting desire "to save the lives of unborn children" as defense to FACE violation). As the district court said in a prior proceeding involving these same defendants:

> That seal above my head says … this is Caesar's court. This is not a church, this is not a temple, this is not a mosque. And we don't live in a theocracy. This is a court of law.

*United States v. Lynch,* 104 F.3d 357, 1996 WL 717912, at *2, 1996 U.S.App. LEXIS 32729, at *4–5 (2d Cir.1996) (*mem.*), *cert. denied,* —— U.S. ——, 117 S.Ct. 1436, 137 L.Ed.2d 543 (1997).

Nevertheless, we conclude that the district court's error of law influenced its finding as to wilfulness and is integral to that element; it cannot be deemed (as the government argues) to be an additional, distinct, and severable element.

(3) Having decided that the aspect of the judgment challenged by the government is in its essential nature factual rather than legal, we must conclude (contrary to the government's third argument) that the Double Jeopardy Clause bars this appeal. We lack jurisdiction over the prosecution's appeal if "the ruling of the judge, whatever its label, actually represents a resolution [in the defendant's favor], correct or not, of some or all of the factual elements of the offense charged." *Scott,* 437 U.S. at 97, 98 S.Ct. at 2197 (quoting *Martin Linen Supply Co.,* 430 U.S. at 571, 97 S.Ct. at 1355) (quotation marks omitted). Here, the factual element is wilfulness, and the district court explicitly resolved it in favor of Lynch and Moscinski. *See Lynch,* 952 F.Supp. at 170. It does not matter that this factual finding was arrived at under the influence of an erroneous view of the law. "[T]he fact that the acquittal may result from … erroneous interpretations of governing legal principles affects the accuracy of that determination, but it does not alter its essential character." *Scott,* 437 U.S. at 98, 98 S.Ct. at 2197 (citation and internal quotation marks omitted); *see Smalis v. Pennsylvania,* 476 U.S. 140, 144 n. 7, 106 S.Ct. 1745, 1748 n. 7, 90 L.Ed.2d 116 (1986) ("The status of the trial court's judgment as an acquittal is not affected by the … allegation that the court erred in deciding what degree of recklessness was … required.") (internal quotation marks omitted). What is decisive for double jeopardy purposes is that the ruling represents a "judgment … by the court that the evidence is insufficient to convict." *Scott,* 437 U.S. at 91, 98 S.Ct. at 2194; *Smalis,* 476 U.S. at 144, 106 S.Ct. at 1748 (quoting *Scott*). We therefore conclude that we lack jurisdiction to consider this appeal under 18 U.S.C. § 3731 and the Double Jeopardy Clause.

(4) We do not reach the question whether an appellate court reversing an acquittal from a bench trial would have the power to order a trial court to enter a judgment of conviction based solely upon the trial court's prior findings of fact as to the required elements of guilt. Perhaps it can be done, but no court has done it. So far as we can tell, the dissent's statement is the only opinion expressing a willingness to do so.

In undertaking to show the absence of any remaining fact issue for the district court, the dissent has taken the district court's finding on wilfulness, dismantled it, studied its constituent evidence, and put it back together again without the flaw of legal error. What defeats this otherwise laudable project is that the evidence thus reconstituted is the evidence that bears upon one element of the case, as to which the district court has made a finding that released these defendants from the jeopardy in which they stood. Thus the dissent disregards the district court's troublesome determination that the defendants' conduct "as a matter of fact" was *not* wilful—and judged that it compels the opposite finding on that key element. The dissent seemingly avoids subjecting the defendants to a new jeopardy by the economical expedient of simply directing the district court to enter a judgment of conviction; but the defendants who would be called upon to serve their sentences would experience such a disposition as a factual reevaluation of guilt by the appellate court, and a new jeopardy.[3]

## CONCLUSION

We lack appellate jurisdiction, and dismiss the appeal.

SACK, Circuit Judge (concurring):

I concur in the opinion of the Court and accept its reasoning. I am convinced that we are forbidden to hear the substantive issues that the government seeks to appeal. Because of their importance, however, I write separately to offer some additional observations as to why I think we cannot hear them. Under the Criminal Appeals Act of 1970, read in the light of the history and purpose of the Fifth Amendment's Double Jeopardy Clause, we must decline the government's invitation, in effect, to retry the defendants in this Court on the record and opinion below.

In dismissing the government's appeal, the opinion of the Court relies on, *inter alia*, the Criminal Appeals Act of 1970 (the "Act"), codified as 18 U.S.C. § 3731. The Act authorizes federal prosecutors to appeal "from a decision, judgment, or order of a district court dismissing an indictment or information ... *except that no appeal shall lie where the double jeopardy clause of the United States Constitution prohibits further prosecution.*" *Id.* (emphasis added). Largely as a vestige of the common-law rule prohibiting the government from appealing in criminal cases absent explicit statutory warrant,[1] government appeals in criminal cases prior to the Act were rare. *See United States v. Scott,* 437 U.S. 82, 89, 98 S.Ct. 2187, 57 L.Ed.2d 65 (1978).

The purpose of the Act was to give the government something new, the ability to appeal in criminal cases "to the constitutional

---

**3.** The government makes two additional arguments on appeal.

First, it maintains that the district court's alternative ground for acquittal—the court's "prerogative of leniency"—was erroneous. It is altogether unclear whether this prerogative amounts to nullification, as the government contends (*see United States v. Thomas,* 116 F.3d 606, 614–18 (2d Cir.1997), and *United States v. Maybury,* 274 F.2d 899, 902–03 (2d Cir.1960)), or is something else. In any event, we lack jurisdiction to resolve this question.

Second, the government argues that in the event of a remand, we should assign this case to a different district court judge. Our resolution of the jurisdictional issue renders this issue moot as

well. It therefore remains for the district court, whose findings exhibit perfect candor, to determine for itself whether it possesses the objectivity necessary to consider future proceedings involving these defendants, when and if any arise.

**1.** In 1907, Congress passed the first Criminal Appeals Act, 34 Stat. 1246, but "the rules governing the conditions of appeal became highly technical .... [and the Supreme Court] concluded that the Act was a 'failure ... a most unruly child that ha[d] not improved with age.'" *United States v. Wilson,* 420 U.S. 332, 337, 95 S.Ct. 1013, 43 L.Ed.2d 232 (1975) (quoting *United States v. Sisson,* 399 U.S. 267, 307, 90 S.Ct. 2117, 26 L.Ed.2d 608 (1970)).

limits." *United States v. Wilson,* 420 U.S. 332, 338, 95 S.Ct. 1013, 43 L.Ed.2d 232 (1975). But "the constitutional limits" were not new. Adopted in 1791, the Double Jeopardy Clause of the Fifth Amendment reads: "No person shall ... be subject for the same offence to be twice put in jeopardy of life or limb." Ensconced between the accused felon's right to prosecution by grand jury indictment and the freedom from compelled self-incrimination, the Double Jeopardy Clause is a basic safeguard of the individual against the might of the state.

> The underlying idea, one that is deeply ingrained in at least the Anglo–American system of jurisprudence, is that the State with all its resources and power should not be allowed to make repeated attempts to convict an individual for an alleged offense, thereby subjecting him to embarrassment, expense and ordeal and compelling him to live in a continuing state of anxiety and insecurity.

*United States v. Jenkins,* 420 U.S. 358, 370, 95 S.Ct. 1006, 43 L.Ed.2d 250 (1975) (quoting *Green v. United States,* 355 U.S. 184, 187, 78 S.Ct. 221, 2 L.Ed.2d 199 (1957)). "[T]he double jeopardy prohibition of the Fifth Amendment represents a fundamental ideal in our constitutional heritage." *Benton v. Maryland,* 395 U.S. 784, 794, 89 S.Ct. 2056, 23 L.Ed.2d 707 (1969).

The obvious bears underscoring: Had Congress chosen not to set forth the double-jeopardy limitation in the Act, the Fifth Amendment would have imposed it nonetheless.

In *United States v. Jenkins,* 490 F.2d 868, 870–74 (2d Cir.1973) (Friendly, *J.*), *aff'd,* 420 U.S. 358, 95 S.Ct. 1006, 43 L.Ed.2d 250 (1975), and again in *United States v. Morgan,* 51 F.3d 1105, 1111–12 (2d Cir.) (Cardamone, *J.*), *cert. denied,* 516 U.S. 861, 116 S.Ct. 171, 133 L.Ed.2d 112 (1995), this Court meticulously rehearsed the history of the Constitution's double-jeopardy proscription. *See also Wilson,* 420 U.S. at 339–40, 95 S.Ct. 1013; *Bartkus v. Illinois,* 359 U.S. 121, 151–55, 79 S.Ct. 676, 3 L.Ed.2d 684 (1959) (Black, *J.,*

dissenting). Its roots reach back at least to Athens in the Fourth Century B.C., at the time of Demosthenes. *Jenkins,* 490 F.2d at 870 (citing 1 Demosthenes 589 (Vance trans. 1962)). The English common law recognized it as early as the 12th Century, during the dispute between Henry II and Thomas à Becket, in the context of duplicate trials in ecclesiastical and secular courts. *See Jenkins,* 490 F.2d at 871; Martin L. Friedland, DOUBLE JEOPARDY 326–28 (1969).

By 1642, when Lord Coke completed his INSTITUTES OF THE LAWS OF ENGLAND, the common law's concern had broadened to encompass four related safeguards: a prohibition on one or more prosecutions for the same offense following an acquittal (the common law plea of *autrefois*[2] *acquit*); following a conviction (*autrefois convict*); following a conviction for a lesser-included offense (*autrefois attaint*); or following a pardon. *See Jenkins,* 490 F.2d at 871; Jay A. Sigler, DOUBLE JEOPARDY: THE DEVELOPMENT OF A LEGAL AND SOCIAL POLICY 16–19 (1969). *See also* 2 Matthew Hale, THE HISTORY OF THE PLEAS OF THE CROWN, Chap. XXXI (1736) (summarizing the *autrefois* pleas). In 1769, Blackstone used the term "jeopardy" to describe the principle underlying Coke's pleas of *autrefois acquit* and *autrefois convict;* these pleas, he wrote, rested on "th[e] universal maxim of the common law of England, that no man is to be brought into jeopardy of his life, more than once, for the same offence." 4 William Blackstone, COMMENTARIES ON THE LAWS OF ENGLAND 329 (1769).

" 'Coke's *Institutes* were read in the American Colonies by virtually every student of the law' and no citation is needed to establish the impact of Hale and Blackstone on colonial legal thought." *Gannett Co. v. DePasquale,* 443 U.S. 368, 424, 99 S.Ct. 2898, 61 L.Ed.2d 608 (1979) (Blackmun, *J.,* concurring in part, dissenting in part) (quoting *Klopfer v. North Carolina,* 386 U.S. 213, 225, 87 S.Ct. 988, 18 L.Ed.2d 1 (1967)); *see also Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 382 n. 14, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974) (White, *J.,* dissenting) ("The men who wrote and

**2.** "Autrefois," in modern French, means "of the past." ROBERT COLLINS DICTIONNAIRE 54 (Nouvelle Édition 1987).

adopted the [Bill of Rights] were steeped in the common-law tradition of England. They read Blackstone, 'a classic tradition of the bar in the United States' and 'the oracle of the common law in the minds of the American Framers.'") (citation omitted); *Schick v. United States,* 195 U.S. 65, 69, 24 S.Ct. 826, 49 L.Ed. 99 (1904) (similar). It is therefore not surprising that, in constructing a charter of individual liberties to supplement the structural provisions of the Constitution, the Framers looked to common-law protections against the power of the Crown, and adopted the prohibition of double jeopardy reflected in the *Institutes,* the *Pleas,* and the *Commentaries.*

Thus, at the behest of several states, James Madison included in the Bill of Rights he presented to the House of Representatives in June 1789: "No person shall be subject, except in cases of impeachment, to more than one punishment or one trial for the same offence." *Jenkins,* 490 F.2d at 873 (quoting 1 Annals of Cong. 434 (1789)). The Senate changed the prohibition to "be twice put in jeopardy of life or limb by any prosecution," the phrase "by any prosecution" was dropped in committee, and the clause's now familiar wording adopted. Sigler, DOUBLE JEOPARDY at 31–32.

> [E]very person acquainted with the history of governments must know that state trials have been employed as a formidable engine in the hands of a dominant administration.... To prevent this mischief the ancient common law, as well as Magna Charta itself, provided that one acquittal or conviction should satisfy the law; or, in other words, that the accused should always have the right secured to him of availing himself of the pleas of *autrefois acquit* and *autrefois convict.* To perpetuate this wise rule, so favorable and necessary to the liberty of the citizen in a government like ours, so frequently subject to changes in popular feeling and sentiment, was the design of introducing into our Constitution the [Double Jeopardy] clause....

*Ex Parte Lange,* 18 Wall. 163, 85 U.S. 163, 171, 21 L.Ed. 872 (1874) (internal quotation marks and citation omitted; ellipses in the original). It is against this backdrop that the Supreme Court has explored the reach of and limitations on the Criminal Appeals Act of 1970.

In construing the Double Jeopardy Clause both before and after the Act, the Supreme Court has emphasized its ban on subjecting a criminal defendant to multiple proceedings on the issue of guilt or innocence. *See, e.g., Smalis v. Pennsylvania,* 476 U.S. 140, 145, 106 S.Ct. 1745, 90 L.Ed.2d 116 (1986) ("subjecting the defendant to postacquittal fact-finding proceedings going to guilt or innocence violates the Double Jeopardy Clause"); *Wilson,* 420 U.S. at 346, 95 S.Ct. 1013 (the "prohibition against multiple trials [is] the controlling constitutional principle"); *Kepner v. United States,* 195 U.S. 100, 133, 24 S.Ct. 797, 49 L.Ed. 114 (1904) ("to try a man after a verdict of acquittal is to put him twice in jeopardy").

Whatever the vagaries of the Double Jeopardy Clause,[3] this much seems certain: Under the prohibition, the government cannot appeal a jury's acquittal. And, although we can imagine a double-jeopardy regimen in which protection of the citizen-jury's autonomy requires that a jury's acquittal be more rigorously safeguarded than a judge's, the Supreme Court has made it equally clear that the rule prohibiting the revisitation of acquittals applies as much to trials in which a judge decides the facts as it does to a prosecution tried to a jury. *See, e.g., Finch v. United States,* 433 U.S. 676, 677, 97 S.Ct. 2909, 53 L.Ed.2d 1048 (1977) (per curiam); *Jenkins,* 420 U.S. at 365–66, 95 S.Ct. 1006; *United States v. Sisson,* 399 U.S. 267, 290, 90 S.Ct. 2117, 26 L.Ed.2d 608 (1970).

In *United States v. Wilson,* 420 U.S. 332, 95 S.Ct. 1013, 43 L.Ed.2d 232 (1975), decided several years after the Act's adoption, the Supreme Court considered an appeal after a jury had convicted the defendant of embezzlement. Subsequent to the conviction, the trial court dismissed the indictment on the

---

**3.** *See, e.g.,* Akhil Reed Amar, *Double Jeopardy Law Made Simple,* 106 YALE L.J. 1807 (1997); Peter Westen, *The Three Faces of Double Jeopar-* dy: *Reflections on Government Appeals of Criminal Sentences,* 78 MICH. L.REV. 1001 (1980).

theory that preindictment delay had made a fair trial impossible. The government, seeking to use the powers recently granted to it by the Act, appealed, but the court of appeals dismissed the appeal on double-jeopardy grounds. The Court reversed, holding that there was no double-jeopardy bar because the appeals court, if it found the trial court's ruling depended on legal error, could simply reinstate the jury's verdict. There was no need for a further trial or other proceeding to resolve factual issues, no prospect of a second "jeopardy" prohibited by the Fifth Amendment. *Id.* at 353, 95 S.Ct. 1013.

In *United States v. Jenkins*, 420 U.S. 358, 95 S.Ct. 1006, 43 L.Ed.2d 250 (1975), decided the same day as *Wilson*, the Supreme Court held that the Double Jeopardy Clause forbade an appeal where, after a bench trial and without a general finding of guilt, the trial court had dismissed the indictment and discharged the defendant. *Id.* at 367, 95 S.Ct. 1006. Unlike in *Wilson*, the circumstances did not permit "a reversal with instructions to reinstate the general finding of guilt: there was no such finding, in form or substance, to reinstate." *Id.* at 368, 95 S.Ct. 1006.

> Even if the District Court were to receive no additional evidence, it would still be necessary for it to make supplemental findings. The trial, which could have resulted in a judgment of conviction, has long since terminated in respondent's favor. To subject him to any further such proceedings at this stage would violate the Double Jeopardy Clause.

*Id.* at 370, 95 S.Ct. 1006.

The *Jenkins* court, by way of a dictum, observed:

> In a bench trial, both functions [the jury as a finder of fact and the judge as a ruler on questions of law] are combined in the judge, and a general finding of "not guilty" may rest either on the determination of facts in favor of a defendant or on the resolution of a legal question favorably to him. If the court prepares special findings of fact, either because the Government or the defendant requested them or because the judge has elected to make them *sua sponte*, it may be possible upon sifting

those findings to determine that the court's finding of "not guilty" is attributable to an erroneous conception of the law whereas the court has resolved against the defendant all of the factual issues necessary to support a finding of guilt under the correct legal standard.

*Id.* at 366–67, 95 S.Ct. 1006. This is the dictum on which the government relies in pursuing this appeal.

It is significant that *Wilson* and *Jenkins* were decided the same day; they are jurisprudential bookends. *Wilson* determined that a jury's guilty verdict wrongly set aside by a judge could be reinstated by an appellate court. There was no double jeopardy because no additional trial, no second "jeopardy," was required for conviction. The *Jenkins* dictum applied the same principle to bench trials. Just as, under *Wilson*, an appellate court may reverse a trial judge in order to reinstate a jury's guilty verdict, under *Jenkins*, we may overturn a trial court's judgment for a criminal defendant in a bench trial if, but only if, we are in effect reinstating a finding of guilt by the trial judge; where "the court has resolved against the defendant all of the factual issues necessary to support a finding of guilt under the correct legal standard." *Id.* at 367, 95 S.Ct. 1006.

There are, as the opinion of the Court notes, four factual findings that the court below was required to make in the case at bar in order to convict the defendants of contempt of court: that the government had proved beyond a reasonable doubt that "(1) the [district] court [had] entered a reasonably specific order [of which the defendants were accused of being in contempt]; (2) [the defendants] knew of that order; (3) [the defendants] violated that order; and (4) [their] violation was willful." *United States v. Cutler*, 58 F.3d 825, 834 (2d Cir.1995). The district judge, acting as the trier of fact, found the government proved the first three elements, but not the fourth, willfulness, reasoning that the defendants' "objectively based and, indeed, conscience-driven religious belief, preclude[d] a finding of willfulness." *United States v. Lynch*, 952 F.Supp.

167, 170 (S.D.N.Y.1997). He therefore acquitted the defendants.

The government urges that the *Jenkins* dictum allows this appeal, permitting us to "sift" the findings of fact below to determine for ourselves whether the defendants were in fact "willful" and therefore guilty of contempt.[4] But that is not, I think, what the *Jenkins* dictum says, means or permits us to do.

Judge Sprizzo did *not* "resolve against the defendant[s] all of the factual issues necessary to support a finding of guilt." *Jenkins*, 420 U.S. at 367, 95 S.Ct. 1006. Instead, he specifically found that willfulness,[5] the fourth issue, had not been proved beyond a reasonable doubt. "[A] verdict or general finding of guilt by the trial court is a necessary predicate to conviction," *Finch*, 433 U.S. at 677, 97 S.Ct. 2909, and there was none here. There is thus no conviction for us to reinstate.[6]

If we were to examine the record below, including the stipulation on which the court's judgment was based, together with the opinion of the court containing its explanation for its findings of fact, as the dissent does, we might come to a conclusion different from the district court's, for reasons spelled out in the dissent. But that is precisely what the Double Jeopardy Clause forbids us to do. Having been acquitted by the trial court, the defendants can never be tried again for the same offense. And that principle holds irrespective of whether the prohibited second trial would be held anew in the district court or by this Court on the record created below.

"The court of first instance, having jurisdiction to try the question of the guilt or innocence of the accused, found [Lynch and Moscinski] not guilty; to try [them] again upon the merits, even in an appellate court, is to put [them] a second time in jeopardy for the same offense." *Kepner v. United States,* 195 U.S. 100, 133, 24 S.Ct. 797, 49 L.Ed. 114 (1904).

Between July 1971, the year after the Criminal Appeals Act was passed, and June 1997, the last year for which statistics are available, there were 42,565 criminal bench trials in the federal district courts, 11,488 of them ending in acquittal. 1972–1997 ADMIN. OFF. U.S. CTS. ANN. REP. Table D–7. We may assume, I think, that inasmuch as judges are human and the trial process imperfect, some of the acquittals resulted in the guilty going free. Yet not a single one of those acquittals appears to have been overturned on appeal.

That is as it should be. If and when there is a wrongful acquittal, the remedy, if remedy there be, rarely if ever lies on appeal. There is a price, but it is one carefully exacted by the Fifth Amendment.

FEINBERG, Circuit Judge (dissenting):

I respectfully dissent. In my view, the district judge found all of the facts necessary to convict defendants Bishop George Lynch and Christopher Moscinski (also known as Brother Fidelis) of criminal contempt under the correct legal standard, and found them not guilty based solely on legal error. As a result, the Double Jeopardy Clause does not

---

**4.** The statement in *Jenkins* is, as we have pointed out, a dictum and *Jenkins* itself was overruled in *United States v. Scott*, 437 U.S. 82, 98 S.Ct. 2187, 57 L.Ed.2d 65 (1978), albeit in the course of broadening the government's ability to appeal. The dictum was, however, adopted by this court in *United States v. Fayer*, 523 F.2d 661, 663–64 (2d Cir.1975), shortly after *Jenkins* was decided, and we write on the assumption that it is good law.

**5.** The finding of willfulness in a contempt case is a finding of fact. *See, e.g., United States v. Themy–Kotronakis*, 140 F.3d 858, 864 (10th Cir. 1998); *United States v. Rapone*, 131 F.3d 188, 195 (D.C.Cir.1997); *In re Levine*, 27 F.3d 594, 596 (D.C.Cir.1994), *cert. denied*, 514 U.S. 1015, 115 S.Ct. 1356, 131 L.Ed.2d 214 (1995); *United*

*States v. Metropolitan Disposal Corp.*, 798 F.2d 1273, 1274 (9th Cir.1986).

**6.** One can imagine a case, however rare, in which a judge's not-guilty verdict could be overturned under the *Jenkins* dictum. If the district court here had found willfulness but had acquitted the defendants on the explicit but erroneous ground, say, that injury to the clinic and its patients was also an element of the crime but had not been established, the dictum might well permit such a reversal. The district court would have, in effect, convicted the defendants by finding against them on all elements of the crime. We would merely be reinstating that conviction by reversing the district court's erroneous holding that injury is also an element of contempt. This, however, is not such a case.

bar the government's appeal because no further factual proceedings would be required on remand in order to establish Lynch and Moscinski's guilt. I would thus allow the appeal. Reaching the merits, I would vacate the district court's judgment and remand the case to the district court for entry of a judgement of conviction.

## I. Factual Background

The procedural posture of this case is highly unusual. Defendants have a history, going back to 1990, of blocking access to the Women's Medical Pavilion ("Clinic") in Dobbs Ferry, New York. For doing so, each has been convicted several times in local criminal courts of violating criminal statutes. One such incident, a May 1995 driveway "sit-in" that impeded vehicular access to the Clinic, led the government to file a civil complaint against Lynch and Moscinski alleging that their conduct violated the Freedom of Access to Clinic Entrances Act (FACE), 18 U.S.C. § 248. The government also moved for a preliminary injunction enjoining defendants from coming within 15 feet of the Clinic and from further violating the statute. The hearing on the injunction was consolidated with a trial on the merits in the district court pursuant to Fed.R.Civ.P. 65(a)(2). In February 1996, the court found that Lynch and Moscinski had violated FACE by sitting in the Clinic's driveway and thus making access unreasonably difficult, and issued a permanent injunction (the Injunction) enjoining them from committing further violations, including "impeding or obstructing automotive or any other form of ingress into, or egress from, the [Clinic]." The Injunction was affirmed on appeal. See *United States v. Lynch*, 104 F.3d 357 (2d Cir.1996), cert. denied, *Lynch v. United States*, — U.S. —, 117 S.Ct. 1436, 137 L.Ed.2d 543 (1997).

Within a matter of weeks after the district court issued the Injunction in February 1996, Lynch disregarded it and obstructed access to the Clinic by sitting against its doors. On August 24, 1996, the district court found

Lynch in civil contempt of the Injunction, but denied the government's request for damages because of what the judge saw as possible First Amendment entanglement problems that would be created by an attempt to collect the statutory fine. He repeatedly suggested to the government that the appropriate way to enforce the injunction would be a charge of criminal contempt.

Also on August 24, 1996, the conduct that led to this appeal took place. Lynch and Moscinski once again sat in the Clinic's driveway and prevented several cars from entering the Clinic's parking lot. They were arrested and charged with criminal contempt. The judge stated that he would impose a prison sentence of less than six months if the defendants were found guilty on the criminal contempt charge; accordingly, the case was tried without a jury.

At the trial, Lynch stated on direct examination that he lacked "any respect for the laws, by whomever made, that would forbid [him] to express [his] contempt for legalized abortion." On cross-examination, he stated that he sat in the Clinic's driveway deliberately. Similarly, when Moscinski was asked by the judge why he thought it was necessary to block the driveway, he stated that "a woman ... going into the [Clinic] ... [who] sees people willing to be arrested, might think twice about the seriousness or gravity of the situation." In addition, the parties stipulated that on the day in question (1) Lynch and Moscinski were sitting in the driveway of the Clinic; (2) several vehicles unsuccessfully attempted to enter the Clinic's parking lot; (3) Lynch and Moscinski were informed by police that they were violating the law; (4) Lynch and Moscinski acknowledged the warning and refused to leave; (5) they knew of the Injunction that had been entered against them; and (6) they knew that the Injunction enjoined them from "impeding or obstructing automotive or any other form of ingress into, or egress from, the [Clinic]."[1] The judge specifically incor-

---

1. The stipulation was as follows:

    IT IS HEREBY STIPULATED AND AGREED by and between the United States of America, by Mary Jo White, United States Attorney, Nicole A. LaBarbera, Assistant United States Attorney, George

Lynch, the defendant, Christopher Moscinski, the defendant, and their counsel, A. Lawrence Washburn, Jr., Esq., that on February 23, 1996, Judge John E. Sprizzo entered an Order Imposing Permanent Injunction in *United States v. Lynch*, 952

porated the stipulation into his findings of fact.

Despite this record, in January 1997 the district court found the defendants not guilty of criminal contempt and dismissed the charges against them. See *United States v. Lynch*, 952 F.Supp. 167, 172 (S.D.N.Y.1997). The stated ground for the court's decision was that it had found "beyond a reasonable doubt that neither Lynch nor Moscinski acted with the willfulness which criminal contempt requires." *Id.* at 170. The court defined "willfulness" to require "deliberate conduct done with a bad purpose either to disobey or disregard the law," and held that defendants' "sincere, genuine, objectively based and, indeed, conscience-driven religious belief, precludes a finding of willfulness." *Id.* The court further held that, even if Lynch and Moscinski had acted willfully, it would still have found them not guilty by exercising "the prerogative of leniency which a fact-finder has to refuse to convict a defendant, even if the circumstances would otherwise be sufficient to convict." *Id.* at 171.

This appeal by the government followed.

## II. Double Jeopardy and Prosecution Appeals

The Double Jeopardy Clause generally bars appellate review of verdicts of acquittal. *Sanabria v. United States*, 437 U.S. 54, 64, 98 S.Ct. 2170, 57 L.Ed.2d 43 (1978); *United States v. Martin Linen Supply Co.*, 430 U.S. 564, 571, 97 S.Ct. 1349, 51 L.Ed.2d 642 (1977). However, the Clause is principally meant not as a general ban on appeals by the government, but as a safeguard against the threat of multiple prosecutions. See *North Carolina v. Pearce*, 395 U.S. 711, 717, 89 S.Ct. 2072, 23 L.Ed.2d 656 (1969) (citing *Ex Parte Lange*, 18 Wall. 163, 21 L.Ed. 872 (1874) and In re Nielsen, 131 U.S. 176, 9 S.Ct. 672, 33 L.Ed. 118 (1889)). Indeed, a clear theme of the Supreme Court's Double Jeopardy Clause jurisprudence is that the Clause does not bar further proceedings that can be accomplished without subjecting the defendant to subsequent factfinding by a trier of fact. See, e.g., *Schiro v. Farley*, 510 U.S. 222, 230, 114 S.Ct. 783, 127 L.Ed.2d 47 (1994) ("the prohibition against multiple trials is the controlling constitutional principle"); *United States v. DiFrancesco*, 449 U.S. 117, 132, 101 S.Ct. 426, 66 L.Ed.2d 328 (1980) (same); *United States v. Scott*, 437 U.S. 82, 91 n. 7, 98 S.Ct. 2187, 57 L.Ed.2d 65 (1978) (pointing out that "a judgment of acquittal could be appealed where no retrial would be needed on remand"); *United States v. Jenkins*, 420 U.S. 358, 366–67, 95 S.Ct. 1006, 43 L.Ed.2d 250 (1975); *United States v. Wilson*, 420 U.S. 332, 336–39, 346, 95 S.Ct. 1013, 43 L.Ed.2d 232 (1975). It is true that the Court has emphasized the finality of an acquittal. See *Tibbs v. Florida*, 457 U.S. 31,

F.Supp. 167, and that the Order provided as follows:

"It is Hereby Ordered that defendants George Lynch and Christopher Moscinski, their agents, and all individuals acting in concert with defendants or their agents, are permanently enjoined from violating, or aiding and abetting the violation of, the Freedom of Access to Clinic Entrances Act of 1994, 18 U.S.C. § 248, in any way, including but not being limited to:

1. impeding or obstructing automotive or any other form of ingress into, or egress from, the Women's Medical Pavilion in Dobbs Ferry, New York; and

2. attempting to take—or inducting [sic], encouraging, directing, aiding, or abetting in any manner others to take—any of the actions set forth in subparagraph 1 of this order."

It is Further Stipulated and Agreed that on August 24, 1996 at approximately 7:30 a.m., officers of the Dobbs Ferry Police Department were called to the Women's Medical Pavilion ("Clin-

ic"), 88 Ashford Avenue, Dobbs Ferry, New York, where George Lynch and Christopher Moscinski, the defendants, were "seated in the driveway area" of the Clinic. A police officer "observed several vehicles unsuccessfully attempt to enter the parking lot." At approximately 7:50 a.m. a police officer informed the defendants that "they were in violation of the law and that if they did not leave the area immediately they would be arrested." The defendants "acknowledged the warning and refused to leave." The officer then arrested the defendants, both of whom went "limp" and had to be carried to a bus for transport to the police station.

It is Further Stipulated and Agreed that on August 24, 1996, at the time George Lynch and Christopher Moscinski, the defendants, sat in the Clinic's driveway, they knew of the Order Imposing Permanent Injunction in *United States v. Lynch*, 952 F.Supp. 167, and knew that the Order enjoined them from "impeding or obstructing automotive or any other form of ingress into, or egress from, the Women's Medical Pavilion in Dobbs Ferry, New York."

41, 102 S.Ct. 2211, 72 L.Ed.2d 652 (1982). However, as already indicated, the Court has also made clear that a judgment of acquittal may be appealed where no further factfinding would be needed on remand. See *Scott*, 437 U.S. at 91 n. 9, 98 S.Ct. 2187; *Jenkins*, 420 U.S. at 366–67, 95 S.Ct. 1006; *Wilson*, 420 U.S. at 336–39, 346, 95 S.Ct. 1013; see generally 15B Wright & Miller, Federal Practice and Procedure, § 3919.5 (2d ed.1992).

## A. The *Jenkins* Test

Two of the aforementioned cases, *Jenkins* and *Wilson*, bear directly on the matter before us. In *Wilson*, the district court dismissed criminal charges against the defendant on speedy trial grounds after a jury found the defendant guilty of embezzling funds from a labor organization. The Supreme Court held that the Double Jeopardy Clause posed no bar to the government's appeal of the dismissal, noting that "the constitutional protection against Government appeals attaches only where there is a danger of subjecting the defendant to a second trial for the same offense." 420 U.S. at 336, 95 S.Ct. 1013. Elaborating, the Court stated that "a defendant has no legitimate claim to benefit from an error of law when that error could be corrected without subjecting him to a second trial before a second trier of fact." Id. at 345, 95 S.Ct. 1013.

The Court applied *Wilson* in its opinion in *Jenkins*, issued the same day. In *Jenkins*, a defendant charged with failing to submit to induction into the armed forces was acquitted by a district judge after a bench trial on the merits. The judge held that defendant was wrongfully denied a postponement by his local draft board that would have permitted consideration of his conscientious objector claim. The government appealed, arguing that the basis for the acquittal was incorrect as a matter of law. Faced with the question of whether the government's appeal constituted double jeopardy, the Court discussed the application of *Wilson* to appeals that follow bench trials:

> In a case tried to a jury, the distinction between the jury's verdict of guilty and the court's ruling on questions of law is easily perceived. In a bench trial, both functions are combined in the judge, and a general finding of "not guilty" may rest either on the determination of facts in favor of a defendant or on the resolution of a legal question favorably to him. If the court prepares special findings of fact, either because the Government or the defendant requested them, or because the judge has elected to make them *sua sponte*, it may be possible upon sifting those findings to determine that the court's finding of "not guilty" is attributable to an erroneous conception of the law whereas the court has resolved against the defendant all of the factual issues necessary to support a finding of guilt under the correct legal standard.

420 U.S. at 366–67, 95 S.Ct. 1006. A court's resolution of facts against the defendant may be express or implied, see id. at 367, 95 S.Ct. 1013, and the resolution may be made "in form or in substance." Id. at 368, 95 S.Ct. 1013. In *Jenkins*, the Court applied the rule quoted above and held that, because further proceedings would have been required to resolve the factual issues relating to the elements of the offense charged, the appeal was barred by the Double Jeopardy Clause.

*Jenkins* was partially overruled three terms later by *Scott*, which held that the Double Jeopardy Clause poses no obstacle to the re-prosecution of a defendant who successfully moves to dismiss an indictment in the middle of trial on a ground unrelated to the defendant's actual guilt or innocence, despite the fact that further factual proceedings would be required on remand. *Scott*, in other words, *broadened* the government's ability to appeal and indicated that the assumption in *Jenkins* "that a judgment of acquittal could be appealed where no retrial would be needed on remand" remained good law. *Scott*, 437 U.S. at 91 n. 7, 98 S.Ct. 2187; see also *Smalis v. Pennsylvania*, 476 U.S. 140, 146 n. 9, 106 S.Ct. 1745, 90 L.Ed.2d 116 (1986) (*Scott* "overrules *Jenkins* only insofar as *Jenkins* bars an appeal by the government when a defendant successfully moves for dismissal on a ground 'unrelated to factual guilt or innocence.' ").

This court applied the rule in *Jenkins* more than two decades ago in an appeal similar to the one now before us. In *United States v. Fayer*, 523 F.2d 661 (2d Cir.1975), defendant Fayer, an attorney, was charged with corruptly endeavoring to influence a witness in violation of 18 U.S.C. § 1503. The case was tried as a bench trial, and the district judge made special findings of fact pursuant to Fed.R.Crim.P. 23(c). The prosecution's evidence included a tape-recorded conversation between Fayer and a cooperating witness (Goodwin) in which, among other things, Fayer urged Goodwin not to testify before a grand jury. In his defense, Fayer testified that he was simply trying to give Goodwin legal advice because he felt that Goodwin's attorney was inexperienced and unqualified. The district court acquitted Fayer. It found that one of Fayer's motives for approaching Goodwin and urging him not to testify was to protect two clients who were targets of investigation into Federal Housing Authority corruption, but the court also found Fayer's testimony worthy of belief. The government attempted to appeal the acquittal, correctly arguing that, as a matter of law, Fayer's bad motive was sufficient to sustain a conviction under 18 U.S.C. § 1503 despite the simultaneous presence of a good motive.

In *Fayer*, we defined "[t]he *Jenkins* test" of appealability as

> whether it is "clear that the court, in its findings of fact and conclusions of law, expressly or *even impliedly* found against the defendant on all issues necessary to establish guilt under even the Government's formulation of the applicable law." Put another way, the question is whether "further proceedings of some sort, devoted to the resolution of factual issues going to the elements of the offense charged, would have been required upon reversal and remand."

*Id.* at 663–64 (emphasis supplied) (citations omitted); see also *United States v. Ceccolini*, 542 F.2d 136, 140 (2d Cir.1976). Applying the *Jenkins* test as the governing rule of law, we then held that for two reasons the district court had not implicitly found against the defendant as to all issues necessary to establish guilt under the correct legal standard. First, we were "constrained," 523 F.2d at 662, to hold that the findings were "ambiguous as to . . . whether [Fayer's conduct] was innocent protection of a client or a cover-up of crimes of the clients. . . ." *Id.* at 664. Second, the district judge had credited Fayer's testimony which "explicitly contradict[ed] . . . an implicit reading of the findings as to motive. . . ." *Id.* Accordingly, because the trial judge's findings were sufficiently ambiguous, *id.* at 662, we were "forced to conclude", *id.* at 664, that the *Jenkins* test had not been met and that the acquittal could not be appealed.

B.  Application of the *Jenkins* test.

Thus, the key to proper application here of the *Jenkins* test is whether, after "sifting" through the judge's findings of fact, we can say that he expressly or impliedly resolved against Lynch and Moscinski all of the factual issues necessary to support a finding of criminal contempt under the correct legal standard. The government was required to "prove beyond a reasonable doubt that: (1) the court entered a reasonably specific order; (2) [the defendants] knew of that order; (3) [the defendants] violated that order; and (4) [their] violation was willful." *United States v. Cutler*, 58 F.3d 825, 834 (2d Cir.1995). There can be no doubt that the judge resolved the first three elements in favor of the prosecution when he incorporated the parties' stipulation into his findings.

As to the fourth element—willfulness—a sifting of the findings unmistakably shows that the judge found beyond a reasonable doubt all of the facts necessary to establish willfulness, properly defined as "a specific intent to consciously disregard an order of the court." *Id.* at 837. First, the judge found that Lynch and Moscinski "acted out of a sense of conscience and sincere religious conviction" when they engaged in the conceded conduct at issue. 952 F.Supp. at 169. If Lynch and Moscinski's religious conviction led them to sit in the Clinic's driveway, they obviously were not there by mistake or accident. Also, by incorporating the parties' stipulation, see footnote 1 supra, into his findings, the judge found that (1) Lynch and Moscinski were seated in the Clinic's drive-

way; (2) they were told by police that they were in violation of the law; and (3) they acknowledged the warning and refused to leave. Unlike the findings at issue in *Fayer*, these are not at all ambiguous. Lynch and Moscinski did not dispute the government's factual allegations.[2] They raised no legally cognizable defense. The judge heard no legally exculpatory testimony. His findings establish beyond a reasonable doubt that Lynch and Moscinski acted willfully when they deliberately violated the specific terms of the court's order, of which they were aware.

The majority[3] and concurring opinions appear to suggest that, in their view, this matter would have been appealable in a factual situation slightly different from the one now before us. The hypothetical situation they appear to contemplate is one where the district judge (1) incorrectly considered bad motive or purpose to be a "fifth element" of criminal contempt separate from and in addition to the four, and only four, correct elements of that crime; (2) found against Lynch and Moscinski on the four correct elements (including willfulness); (3) found in favor of Lynch and Moscinski on the fifth element because they lacked a bad motive or purpose; and (4) found Lynch and Moscinski not guilty because of their lack of a bad motive or purpose. The majority and concurrence seem to agree that, in this situation, the district judge's finding on the incorrect fifth element could, in effect, be severed from the four correct elements and the government's appeal could go forward. I contrast this hypothetical situation with the situation presented by this case, in which the district judge (1) incorrectly considered bad motive or purpose to be an "extra factor" separate from and in addition to the one, and only one,

correct factor required to prove the element of willfulness—deliberateness rather than mistake; (2) expressly found against Lynch and Moscinski on three of the four elements of criminal contempt, and impliedly but undoubtedly found against them on the one, and only one, correct factor (deliberateness rather than mistake) required to prove the element of willfulness; (3) found in favor of Lynch and Moscinski on the incorrect, extra factor of bad motive or purpose, and thus found no willfulness; and (4) found Lynch and Moscinski not guilty because of their lack of a bad motive or purpose. The difference between these two situations is the difference between, on the one hand, calling bad motive or purpose a separate and incorrect "fifth element" added to the four correct elements of criminal contempt and, on the other, calling bad motive or purpose a separate and incorrect "extra factor" of one of the four correct elements of that crime. For the majority and the concurrence, this difference is apparently dispositive.

And therein lies the crux of our disagreement. I submit that what my colleagues see as a fundamental difference is one of semantics. It elevates form over substance. It is true, as the majority opinion points out, that the district court's opinion does not contain an express "finding that the fourth element of criminal contempt—willfulness—was proven beyond a reasonable doubt." However, as just indicated, the judge did impliedly but undoubtedly find that fact. It is also true that the judge held that defendants' "sincere, genuine, objectively based and, indeed, conscience-driven religious belief ... precludes a finding of willfulness." 952 F.Supp. at 170. But, as will be seen below, that statement was incorrect and improperly added the extra requirement of a "bad" purpose or motive

**2.** While not a factor in this analysis, a careful examination of the record suggests that Lynch and Moscinski *conceded* willfulness. At a February 1996 hearing on the issuance of the Injunction (arising out of the defendants' May 1995 driveway sit-in), the following colloquy took place between the judge and defense counsel A. Lawrence Washburn:

> THE COURT: I am not required to [issue an injunction], but the trouble is that you people have violated the statute and have indicated a willingness to do it more than once.

> MR. WASHBURN: In terms of peaceful nonviolent civil disobedience, yes, your Honor, we concede that. That is true.

At a September 1996 pre-trial hearing in regard to the criminal contempt charge (arising out of defendants' August 1996 driveway sit-in) at issue here, Mr. Washburn stated:

> MR WASHBURN: You asked if there was a question of fact. Not more so than before.

**3.** For convenience, Judge Jacobs's opinion is referred to as the majority opinion.

to the government's burden of proof. Because this extra factor was not necessary to prove Lynch and Moscinski's guilt, the government's failure to prove it does not bar this appeal. I agree with (now) Chief Judge Becker's conclusion in *United States v. Maker*, 751 F.2d 614 (3d Cir.1984), cert. denied, 472 U.S. 1017, 105 S.Ct. 3479, 87 L.Ed.2d 614 (1985) that the Double Jeopardy Clause does not bar an appeal where "the district court, as the result of a legal error, determined that the government could not prove a fact that is not necessary to support a conviction." *Id.* at 624.

In sum, the district court impliedly found the element of willfulness against Lynch and Moscinski and in favor of the prosecution. Since all four elements of criminal contempt were thus resolved against the defendants, no further factfinding would be necessary on remand. As a result, I conclude that the Double Jeopardy Clause presents no bar to this court's jurisdiction over this appeal.[4]

### III. The Merits of the Government's Appeal

As frequently is the case, the issue of our jurisdiction to hear this appeal is more difficult to decide than the merits. The government contends that the district court committed two basic errors in its opinion, to which I now turn.

#### A. Willfulness

The district court held that a benevolent, religious motive precludes a finding of willfulness in a criminal contempt proceeding because willful conduct, in that context, "generally means deliberate conduct done with a bad purpose either to disobey or to disregard the law." 952 F.Supp. at 170. I agree with the majority that there is "[n]o doubt" that this understanding of willfulness was legal error. Accordingly, there is no need to labor the point here other than to note again that willfulness in this context requires nothing more than "a specific intent to consciously disregard an order of the court." *Cutler*, 58 F.3d at 837 (criminal contempt). Bad intent is not required. See *United States v. Remini*, 967 F.2d 754, 758 (2d Cir.1992) (criminal contempt). As the government and the amici briefs point out, this error virtually eviscerates FACE by creating a defense for individuals who act out of religious conviction when they intentionally block access to facilities like the Clinic.[5] In this context, willfulness cannot be negated by a sincerely held belief, religious or otherwise, in the correctness of one's actions. See, e.g., *United States v. Edwards*, 101 F.3d 17, 19 (2d Cir.1996); *United States v. Moylan*, 417 F.2d 1002, 1004 (4th Cir.1969). It is clear that individuals motivated by sincere religious belief nonetheless commit criminal contempt when they knowingly and deliberately violate a court order.

#### B. The "Prerogative of Leniency"

The district court similarly erred by claiming for the federal judiciary the power to exercise a so-called "prerogative of leniency" that would allow a judge who sits as a factfinder to acquit a defendant in the face of apparent guilt. At a pre-trial conference, the judge discussed with counsel whether Lynch and Moscinski were entitled to a jury. He stated:

> [A] jury is different than a judge.... [Y]ou could try this contempt to a jury and it could be plain as day that your clients are guilty, but the jury can nullify it. The jury has the power to nullify. They may choose not to convict.... A judge can't do that; a jury can. I guess a judge can do it too if he is sitting as a trier of the fact[s]. In a criminal case the Court of Appeals doesn't have the power to review anything I do on a clearly erroneous standard or otherwise in a criminal case.

---

4. The majority opinion appears to suggest at p. —— that there is no precedent for the analysis used in this dissenting opinion. However, *Jenkins* and *Fayer*—neither of which is discussed in the majority opinion—are both on point. The former suggests the analysis and the latter applies it.

5. This result is particularly ironic since Congress had prior protests at the Clinic in mind when it enacted the statute. See, e.g., House Report at 7, 1994 U.S.C.C.A.N. at 704.

In his opinion, the judge did rely on a jury's power to nullify the law as an alternative basis for acquitting Lynch and Moscinski. The judge stated that he could find "no authority ... that the Court, when it sits as a fact-finder, does not have the same prerogative of leniency" as that of a jury. 952 F.Supp. at 171.

The authority against this claimed prerogative, however, is clear. It is settled that "it is the duty of juries in criminal cases to take the law from the court and apply that law to the facts as they find them to be from the evidence." *Sparf v. United States,* 156 U.S. 51, 102, 15 S.Ct. 273, 39 L.Ed. 343 (1895). Furthermore, a jury may not lawfully reject stipulated facts. See *United States v. Mason,* 85 F.3d 471, 473 (10th Cir.1996). Indeed, the Supreme Court has characterized the practice of jury nullification as the "assumption of a power" which a jury has "no right to exercise," *Dunn v. United States,* 284 U.S. 390, 393, 52 S.Ct. 189, 76 L.Ed. 356 (1932), and as "the unreviewable power of a jury to return a verdict of not guilty for impermissible reasons." *United States v. Powell,* 469 U.S. 57, 63, 105 S.Ct. 471, 83 L.Ed.2d 461 (1984). Four months after the district court's opinion in this case, this court forcefully restated these principles in *United States v. Thomas,* 116 F.3d 606, 614–18 (2d Cir.1997). In *Thomas,* we "categorically" rejected "the idea that, in a society committed to the rule of law, jury nullification is desirable or that courts may permit it to occur when it is within their authority to prevent." *Id.* at 614. In his thorough opinion for the court, Judge Cabranes recognized "that nullification may at times manifest itself as a form of civil disobedience that some may regard as tolerable," *id.,* but pointed out, in language originally employed by Learned Hand, that "the power of juries to 'nullify' or exercise a power of lenity is just that—a power; it is by no means a right...." *Id.* at 615.

Further, in *United States v. Maybury,* 274 F.2d 899 (2d Cir.1960), Judge Friendly noted that "the historic position of the jury affords ample ground for tolerating the jury's assumption of the power to insure lenity." But he immediately went on to say that the *judge* does not have that power, because "the judge is hardly the voice of the community" even when he sits as factfinder. *Id.* at 903. Structurally, judicial nullification violates the separation of powers, for "so long as Congress acts within its constitutional power in enacting a criminal statute, [courts] must give effect to Congress' expressed intention concerning the scope of conduct prohibited." *United States v. Kozminski,* 487 U.S. 931, 939, 108 S.Ct. 2751, 101 L.Ed.2d 788 (1988). By refusing to enforce a valid criminal statute, a judge acts as a quasi-legislator and usurps the Article I functions of Congress. See *Whalen v. United States,* 445 U.S. 684, 689, 100 S.Ct. 1432, 63 L.Ed.2d 715 (1980).

Additionally, the exercise of nullification by a federal judge—even when termed a "prerogative of leniency"—may create an appearance of injustice that cannot be tolerated by a legal system that strives to resolve cases in a reliable, consistent and objective manner. The arbitrariness of a power that would allow an Article III judge to acquit otherwise guilty defendants if and when the judge sees fit to do so simply cannot be reconciled with the Supreme Court's admonition that "to perform its high function in the best way 'justice must satisfy the appearance of justice.'" *In re Murchison,* 349 U.S. 133, 136, 75 S.Ct. 623, 99 L.Ed. 942 (1955) (citation omitted); see also *Maybury,* 274 F.2d at 903 (2d Cir. 1960) (allowing a judge to nullify would not "enhance respect for law or for the courts").

## IV. Conclusion

Because I conclude that the government may bring this appeal and that the verdict of not guilty was the result of gross legal error on the part of the district court, I would vacate the judgment of acquittal and remand to the district court for entry of a judgment of conviction.